**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| **TINA MORRIS, JANET O'CALLAGHAN, MELISSA SLAGLE, SUMMER SELLERS, REBECCA HUSAIN, BARBARA KAMINSKI, MARY DAILEY, ANDREW SMITH, TANYA SPURGEON, JILL ROBERTS**, and **JENNIFER CIPOLLINO**, *individually, and on behalf of the classes and all others similarly situated*, | CLASS ACTION |
| *Plaintiffs*, | Case No.: |
| v. | *Jury Trial Demanded* |
| **SYNEOS HEALTH, INC.,** | |
| *Defendant*. | |

## CLASS ACTION COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiffs Tina Morris, Janet O'Callaghan, Melissa Slagle, Summer Sellers, Rebecca Husain, Barbara Kaminski, Mary Dailey, Andrew Smith, Tanya Spurgeon, Jill Roberts, and Jennifer Cipollino (collectively, "**Plaintiffs**"), for themselves and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to others, as follows:

## INTRODUCTION

1.      This is a class action brought by former employees of Syneos Health, Inc. ("**Syneos**" or "**Defendant**"), alleging a comprehensive pattern and practice of discrimination relating to its COVID-19 Vaccination Mandate (the "**Mandate**") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2 *et seq.* ("**Title VII**"), and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.* (the "**ADA**").  Plaintiffs seek damages, including back pay,

1

front pay, liquidated damages, punitive damages, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which Plaintiffs are entitled.

2. In terminating many hundreds of employees who sought exemption from the Mandate, Syneos engaged in a standardized pattern and practice of discrimination against its religious and disabled employees. Syneos devised and implemented all aspects of the Mandate from its corporate headquarters in Morrisville, North Carolina, and utilized the Mandate to systematically eliminate large percentages of religious and disabled employees from its workforce.

3. The mass termination scheme was orchestrated at the top levels of the company and resulted from a comprehensive and centralized plan, which is demonstrated by the fact that plaintiffs in this case, residing in and working from North Carolina, Ohio, New York, Pennsylvania, Mississippi, South Carolina, and Indiana, suffered terminations that were, in all material aspects, exactly the same. While working from locations across the country, for different managers and in different business units, Plaintiffs were terminated on the same day for identical pretextual reasons, stemming from non-compliance with the same vaccination policy. All of the same reasonable accommodation options were available to Plaintiffs and those similarly situated, yet Syneos refused to offer any of the multiple low-cost and no-cost reasonable accommodation options.

4. Had Syneos simply provided any of the many low cost and no-cost reasonable accommodations available to employees entitled to protections under Title VII and the ADA, it *would have saved* the company significant costs. However, the company's standardized, pretextual justification for terminating hundreds of employees was that "workplace safety" demanded

universal vaccination, and that accommodating its employees, who were entitled to legal protection, would simply be too costly and burdensome.

5.      These justifications are nonsensical. Research from one of the world's most prestigious medical institutions—the Cleveland Clinic—has demonstrated that the risk of contracting COVID-19 *increases with the number of vaccine doses received.*[1] The mass termination scheme was executed during a time when Syneos had actual knowledge that the mandated vaccines were not in fact preserving the "health and safety" of its employees, as evidenced by the fact that Syneos' *vaccinated* employees accounted for the overwhelming majority of COVID-19 positive cases within the workforce during the relevant timeframes, and by the fact that Syneos had actual knowledge that the mandated vaccines were harming employees through adverse reactions. Despite these realities, and without lawful justification, Syneos insisted as a term and condition of employment that religious employees violate their sincerely held religious beliefs, and that medically impaired employees endanger their health.

6.      In addition to being unlawful on a variety of fronts, this policy was glaringly irrational for several more specific reasons. First, hundreds of the employees Syneos terminated, including Plaintiffs, possessed exemplary performance records. The business costs of losing many hundreds of highly productive employees (and the significant expenses of rehiring and training replacements) was a cost Syneos for some reason embraced. In Syneos' campaign to purge as

---

[1] *See* Nabin K. Shrestha *et. al.,* MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (in comprehensive study, researchers found the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**") (emphasis added).

many religious and disabled employees it possibly could, this extraordinary and irrational business cost was not only acceptable, but the self-inflicted wound was vigorously pursued and executed.

7.     Second, there were numerous no-cost and low-cost accommodation options available, including recognition of natural immunity, temporary telework, regular COVID-19 testing requirements (which is a more accurate and reliable countermeasure to COVID-19 than vaccination), enhanced safety protocols, or any combination of the above options. Unlike employers across the country who managed to provide accommodations to vaccination requirements, Syneos conveniently overlooked these possibilities. When the mass termination occurred in January of 2022, free COVID-19 testing was available throughout the country. In addition, many of the employees Syneos terminated were working 100% remotely. The fact that Syneos was actually able to accommodate religious and disabled employees is evidenced by the fact that the company actually accommodated its employees through regular COVID-19 testing (which was available for free throughout the country) for approximately two months during the height of the pandemic. Syneos also managed to seamlessly accommodate and/or exempt from the Mandate all of its religious and medically impaired employees in Florida. And the company lacked a mandatory vaccination policy during the most dangerous periods of the pandemic (despite vaccine availability) while simultaneously recording one of its best earnings years on record with many hundreds of unvaccinated employees in its workforce.

8.     Third, Syneos' refusal to recognize immunity derived from prior COVID-19 infection—"natural immunity"—as satisfying its immunization requirement is especially confounding. As a fully integrated biopharmaceutical solutions organization, Syneos partners with top pharmaceutical companies in both clinical development and sales development for

4

biopharmaceutical products. Because of its specialized experience and knowledge in medical research, specifically immunology, Syneos fully understands the concept of immunization through prior infection, and that natural immunity is universally recognized as *at least equivalent* (but less profitable) to immunity derived from vaccination alone. In the context of COVID-19, natural immunity's desirable relative efficacy has been repeatedly confirmed in the scientific literature.[2] The company's own business records will demonstrate that its vaccinated employees were contracting COVID-19 at incredibly high rates during the relevant timeframes, likely at even higher rates than its unvaccinated employees entitled to protection under Title VII and the ADA. Syneos adhered to strict contact tracing requirements throughout the pandemic. Those records will show Syneos knew that its vaccinated employees were contracting and spreading COVID-19 at the same, similar, or likely even higher rates relative to its unvaccinated employees, especially those possessing natural immunity.

9.     The fact that natural immunity has demonstrated superiority to vaccination alone should be unsurprising given that vaccines merely seek to artificially mimic the body's natural immune response to disease. Nevertheless, despite this commonly understood scientific reality, Syneos refused to accept natural immunity in lieu of vaccination—a no-cost option that could have been recognized as a no-cost accommodation for hundreds of religious and medically impaired employees. This obvious solution would have significantly decreased the number of religious and

---

[2] *See, e.g.,* The Lancet, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext

disabled employees terminated as a result of the Mandate. Recognition of natural immunity was an option that would have actually *saved Syneos significant costs,* as it would have eliminated the costs associated with recruiting, training, and replacing the hundreds of terminated employees, and would have eliminated any purported costs associated with accommodating its naturally immune unvaccinated employees.

10.     The United States Supreme Court has reiterated on several occasions that otherwise illogical employment decisions give rise to an inference of discriminatory animus. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (in justifying the presumption of intentional discrimination in Title VII cases, courts presume that "people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for [taking adverse action against an employee] have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration. . . .").

11.     Here, considering the foregoing, there was no credible justification for terminating many hundreds of religious and disabled employees whose religious beliefs and medical impairments precluded them from receiving a COVID-19 vaccine. Plaintiffs were high-performing employees that contributed substantially to one of Syneos' most profitable years on recent record. Businesses typically do not mass terminate high-performing employees during a labor shortage. As more fully detailed below, Syneos' illogical and counterproductive business decisions generate strong inferences of unlawful company-wide discrimination. The discriminatory agenda was hatched at the top levels of the company, and was applied uniformly across its workforce.

6

## JURISDICTION AND VENUE

12.     This court has original jurisdiction of this civil action as one arising under the laws of the United States. *See* 28 U.S.C. §1331. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et. seq.*, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.

13.     The causes of action arise under Title VII; 42 U.S.C. § 1981a; and the ADA.

14.     Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the pattern, practice, and policy of discrimination originated from and was implemented in this District. In addition, venue is also proper in this District because the records pertaining to the underlying discrimination are located within this District.

## CONDITIONS PRECEDENT

15.     Multiple plaintiffs filed charges of discrimination with the EEOC alleging class-wide discrimination under Title VII and the ADA. Multiple plaintiffs notified the EEOC and Syneos of their intent to pursue charges of discrimination on behalf of themselves and those similarly situated.

16.     For almost one year, Syneos has been on notice that it will face class action litigation under the ADA and Title VII related to the mass termination executed pursuant to the Mandate. Plaintiffs all filed charges of discrimination with their respective EEOC offices, asserting class-wide claims on behalf of themselves and those similarly situated.

17.     Multiple plaintiffs and have received a Notice of Right to Sue based on class-wide discrimination claims arising under Title VII and the ADA.

7

## PARTIES

### A. Defendant

18.    Defendant Syneos is incorporated under the laws of the State of Delaware and has its principal place of business located at 1030 Sync Street, Morrisville, North Carolina.

19.    Syneos is a biopharmaceutical solutions company that assists in the development and commercialization of biopharmaceutical products. Syneos employs over 23,000 individuals across more than 110 countries. In the U.S. alone, Syneos employs over 14,000 people.

20.    Syneos promotes itself as "the only fully integrated biopharmaceutical solutions organization purpose-built to accelerate customer success," partnering with biopharmaceutical companies to offer product development solutions ranging from Phase I clinical trials through commercialization and sales.

21.    Syneos customers consist of over 800 of the world's largest biopharmaceutical companies, along with emerging and specialty biotechnology companies, medical device, and diagnostics companies.

22.    Syneos' business is divided between its Clinical Solutions and Commercial Solutions. Its Commercial Solutions consists of "field based promotional teams" and infrastructure to effectively bring products to market.  Although each Syneos client has 'customized' plans to meet their respective needs, the overall infrastructure for sales remains consistent throughout the organization. Often, sales teams are a combination of Syneos employees and employees of the client, operating in effectively identical roles, just employed by different parties.

8

23.     Syneos is a company "engaged in an industry affecting commerce" with "fifteen or more employees" and thus constitutes an "employer" under both 42 U.S.C. §2000e(b) and 42 U.S.C. §12111(5)(A).

**B. Plaintiffs**

### *Tina Morris*

24.     Plaintiff Tina Morris ("**Morris**") worked for Syneos for over 15 years and resides in Matthews, North Carolina. At the time of her termination, Morris worked as a Field Talent Manager on the GlaxoSmithKline Pharmaceuticals ("**GSK**") contract. Morris performed well in her role, was qualified for her job, and had a very good performance record.

25.     Morris had no office to report to.  Her office was at her home.

26.     Morris has sincere religious beliefs that prevent her from receiving the COVID-19 vaccine. Morris' Christian beliefs in opposition to abortion preclude her from receiving a COVID-19 vaccine because of their connections  to aborted fetal cell lines. On independent grounds, Morris objects because the vaccines contain spiritually unclean materials (such as neurotoxins, chemicals, and foreign genetic material). Due to Morris' religious beliefs, she cannot place spiritually unclean materials into her body, which in her system of religious beliefs, includes the COVID-19 vaccines. Morris provided a detailed religious exemption request to Syneos describing the religious conflict.

27.     Because of her sincerely held religious beliefs in conflict with the COVID-19 vaccine, Morris requested a religious accommodation to the Mandate. After Morris submitted a religious exemption request outlining her religious conflict with the Mandate, Syneos reviewed her exemption request, verified the sincerity and religious nature of Morris' beliefs in conflict with receiving a COVID-19 vaccine, and granted her exemption.

9

28.     Syneos confirmed the religious sincerity of Morris' religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

29.     Morris was not required to regularly test, and continued in her job role (including travel), without restriction while Syneos had full knowledge she was non-compliant with the Mandate. She was given the accommodation of observing the status quo that predated the Mandate.

30.     On December 9, 2021, after allowing Morris to work unvaccinated, and despite never requiring her to regularly test as an accommodation to her religious beliefs, Syneos sent Morris and other similarly situated employees a letter asserting undue hardship. The letter did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, telework, or any combination of the above.

31.     Syneos pretextually refused to offer or otherwise provide these options because of Morris' disfavored religious beliefs.

32.     Morris was terminated because of her religious beliefs.

33.     If it would have preserved her career, Morris would have personally incurred any costs related to providing regular testing.

34.      Syneos terminated Morris on January 31, 2022.

35.     When she was terminated, Morris possessed natural immunity through prior COVID-19 infection and recovery.

10

36.     The realized business costs of losing a high-level and productive employee like Morris—*e.g.*, recruiting, re-training, and various other costs related to business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate her religious beliefs.

37.     Morris filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class-wide claims.

38.     As a direct and proximate cause of Syneos' discriminatory actions, Morris' finances have been significantly and negatively impacted.

39.     In addition to financial loss, Morris has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; sleep disturbances; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Janet O'Callaghan*

40.     Plaintiff Janet O'Callaghan ("**O'Callaghan**") worked for Syneos for 11 years and resides in Cincinnati, Ohio. At the time of her termination, O'Callaghan worked in upper management as a Project Director on the Johnson and Johnson ("**J&J**") account.

41.     O'Callaghan had no office to report to.  Her office was at her home.

42.     O'Callaghan performed well in her role, was qualified for her job, and had a very good performance record.

43.     Syneos terminated O'Callaghan for upholding her religious beliefs in conflict with the Mandate.

44.     O'Callaghan has sincerely held religious beliefs that prevent her from receiving a COVID-19 vaccine because her faith compels her to follow her divinely informed conscience. After prayer and reflection, O'Callaghan was placed under firm conviction that injecting any of the available COVID-19 vaccines into her body would violate her Catholic faith. O'Callaghan provided a detailed religious exemption request to Syneos describing the religious conflict.

45.     Because of her sincerely held religious beliefs in conflict with receiving a COVID-19 vaccine, O'Callaghan requested religious accommodation to the Mandate. After O'Callaghan submitted a religious exemption request outlining her religious conflict, Syneos reviewed her exemption request, verified the sincerity and religious nature of O'Callaghan's beliefs in conflict with receiving a COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

46.     Syneos confirmed the religious sincerity of O'Callaghan's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

47.     On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, continued telework, or any combination of these options.

12

48.    Syneos pretextually refused to offer or otherwise provide these options because of O'Callaghan's disfavored religious beliefs.

49.    O'Callaghan was terminated because of her religious beliefs.

50.    O'Callaghan's role involved management of sales staff that, at most, required 4-5 days of client interaction per month, meetings which could be (and had been) performed remotely.

51.    Syneos did not perform an individualized assessment of O'Callaghan's situation to determine whether it could have accommodated her religious beliefs. Rather, Syneos made a blanket decision that it would terminate most, if not all, employees who possessed religious objections to receiving a COVID-19 vaccine, regardless of Defendant's actual ability to provide a reasonable accommodation for each employee.

52.    If it would have preserved her career, O'Callaghan would have personally incurred any costs related to providing regular testing results.

53.    Despite several low cost and no-cost options for reasonable accommodations, Syneos terminated O'Callaghan on January 31, 2022.

54.    When she was terminated, O'Callaghan possessed natural immunity against COVID-19 through prior infection and recovery.

55.    Syneos terminated O'Callaghan because of her religious beliefs, a decision that entailed significant costs to the company.

56.    The realized business costs of losing a high-level employee like O'Callaghan— e.g., recruiting, re-training, and various other business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate O'Callaghan's religious beliefs.

13

57.     In fact, during 2022 after executing the mass termination scheme, Syneos reached out to many Plaintiffs and other employees it terminated due to the Mandate, and offered incentives for hiring referrals due to Syneos' struggle to find replacements.

58.     O'Callaghan filed a Charge of Discrimination with the Ohio Civil Rights Commission ("**OCRC**"), a charge that was subsequently transferred to the EEOC for further investigation.

59.     As a direct and proximate cause of Syneos' discriminatory actions, O'Callaghan's finances have been significantly and negatively impacted.

60.     In addition to financial loss, O'Callaghan has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Melissa Slagle*

61.     Plaintiff Melissa Slagle ("**Slagle**") worked for Syneos for over five years and resides in Prosperity, South Carolina. At the time of her termination, Slagle worked in management as a Field Talent Manager on the J&J account. Slagle performed well in her role, was qualified for her job, and had a very good performance record. She was also working entirely remotely when she was terminated and could have continued to do so.

62.     Slagle had no office to report to. Her office was at her home.

14

63.     Syneos terminated Slagle for upholding her religious objections in conflict with the Mandate and for declining vaccination due to her medical impairment that Syneos explicitly acknowledged also entitled her to a medical exemption.

64.     Slagle possesses sincerely held religious beliefs that prevent her from receiving a COVID-19 vaccine. Slagle's sincere religious beliefs include her lifelong practice of her Christian faith. Slagle's sincere religious beliefs stem from her lifelong practice of her Christian faith. Based on her Christian faith, Slage objects on both moral and religious grounds to the practice of abortion. Therefore, Slagle is prevented from receiving a COVID-19 vaccine because they were either tested on, or developed using, aborted fetal cell lines. Slagle's faith also requires that she keep faith in God and his design for her body, and by taking the COVID-19 vaccine, she would be demonstrating a lack of faith in her God given immune system. For Slagle, to violate these beliefs would be to demonstrate a lack of faith in God. Slagle provided a detailed religious exemption request to Syneos describing the religious conflict.

65.     Because of her sincerely held religious beliefs, Slagle requested religious accommodation to the Mandate. After Slagle submitted a religious exemption request outlining her religious conflict, Syneos reviewed her exemption request, verified the sincerity and religious nature of Slagle's beliefs in conflict with receiving a COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

66.     Syneos confirmed the religious sincerity of Slagle's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

15

67.     On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several low-cost and no-cost alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, continued telework, or any combination of these options.

68.     There were multiple no-cost and/or less than de minis cost accommodation options available that Syneos could have provided to Slagle.

69.     Syneos pretextually refused to offer or otherwise provide these options because of Slagle's disfavored religious beliefs.

70.     Slagle was terminated because of her religious beliefs.

71.     The realized business costs of losing a high-level employee like Slagle—e.g., recruiting, re-training, and various other business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate Slagle's religious beliefs.

72.     If it would have preserved her career, Slagle would have personally incurred any costs related to providing regular testing.

73.     Slagle also has mitral valve prolapse, a pre-existing medical condition that prevents her from safely receiving a COVID-19 vaccine. This cardiac condition impacts several bodily functions, and if exacerbated, would prevent engagement in daily life activities and could result in severe injury or death.

74.     After contracting COVID-19 in early 2022, Slagle also requested a medical accommodation due to her documented medical impairment. Syneos explicitly acknowledged that

16

Slagle was medically incapable of receiving the COVID-19 vaccine due to her impairment., e-mailing her on January 23, 2022 and stating "your request is confirmed as a valid medical exemption."

75.     However, without engaging in any interactive process calculated towards finding a reasonable accommodation, Syneos terminated Slagle on January 31, 2022, despite the many available accommodation options.

76.     When she was terminated, Slagle possessed natural immunity against COVID-19 through prior infection and recovery.

77.     Slagle filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**"), subsequently amending her charge to include class-wide claims.

78.     As a direct and proximate cause Syneos' discriminatory actions, Slagle's finances have been significantly and negatively impacted.

79.     In addition to financial loss, Slagle has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

80.     In addition to religious discrimination, Slagle has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to place her health and life at risk. As a result of the discriminatory treatment she experienced due to her medical impairment, she is suffering from emotional distress which is or has been marked by lack of focus

17

and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Summer Sellers*

81.     Plaintiff Summer Sellers ("**Sellers**") worked for Syneos for over seven years and resides in Starkville, Mississippi. At the time of her termination, Sellers worked in upper management as a Project Director on the J&J contract. Sellers performed well in her role, was qualified for her job, and had a very good performance record.

82.     Sellers had no office to report to. Her office was at her home.

83.     Syneos terminated Sellers because of her medical impairment that Syneos explicitly acknowledged entitled her to a medical exemption and accommodation. Specifically, after Sellers requested a medical exemption following a severe reaction to the COVID-19 vaccine, Syneos e-mailed Sellers and stated "Your [medical] provider notes a documented anaphylactic allergic reaction or other sever [sic] adverse reaction to any COVID-19 vaccine as the reason you are medically unable to be vaccinated. Your exemption is approved."

84.     For a number of reasons, including concerns related to pre-existing health conditions and a recent COVID-19 infection, Sellers was extremely hesitant to inject a COVID-19 vaccine into her body; however, because of persistent pressure from Syneos and in light of the fact that her career was threatened, Sellers succumbed to Syneos' coercion and received the first dose of the Pfizer-BioNTech vaccine.

85.     Within 24 hours of receiving the injection, Sellers experienced a severe adverse reaction, the aftereffects of which persist to date. Sellers' acute symptoms (within the first 24 hours after vaccination) included severe diarrhea, severe body aches, chills, severe headache, chest pain

18

and burning, a fever of 101 degrees, and vomiting. Long-term, Sellers is suffering ongoing hair loss, Herpes zoster, and "frozen shoulders" in both arms, a known auto-immune condition resulting from COVID-19 vaccination.

86.     These symptoms of her physical impairment precluded Sellers from engaging in major life activities, such as her ability to work, and impacted several major bodily functions. Although some of her symptoms have subsided to a degree, if triggered again through receiving a second dose of the mandated vaccines, Sellers' physical impairment would even more severely limit major life activities, such as her ability to work, as well as several major bodily functions.

87.     Because of her documented reaction to the COVID-19 vaccine, Sellers requested a medical exemption to the Mandate. After Sellers submitted a medical exemption request outlining her medical reasons for inability to receive a second dose, Syneos reviewed her exemption request, verified her medical impairment precluded her from receiving a second dose, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

88.     On December 9, 2021, Syneos reversed course and pretextually revoked the testing accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, continued telework, or any combination of these options.

89.     After revoking the testing accommodation, Syneos did not engage with Sellers in any interactive process calculated towards finding a reasonable accommodation to her medical needs.

19

90.     Syneos refused to offer or otherwise provide these options because of Sellers'
medical impairment. Syneos terminated Sellers because her medical impairment precluded her
from receiving a COVID-19 vaccine.

91.     If it would have preserved her career, Sellers would have personally incurred any
costs related to providing regular testing.

92.     Syneos terminated Sellers on January 31, 2022.

93.     When she was terminated, Sellers possessed natural immunity against COVID-19
through prior infection and recovery.

94.     The realized business costs of losing a high-level employee like Sellers—e.g.,
recruiting, re-training, and various other business interruptions—were greater than any
hypothetical costs Syneos would have incurred to accommodate Sellers' medical impairment.

95.     Sellers timely filed a Charge of Discrimination with the EEOC and later amended
to include class-wide charges.

96.     As a direct and proximate cause of Syneos' discriminatory actions, Sellers' finances
have been significantly and negatively impacted.

97.     In addition to financial loss, Sellers has suffered emotional and psychological harm
from the months of uncertainty and repeated coercion to place her health and life at risk and related
to her unlawful termination. As a result of the discriminatory treatment she experienced, she is
suffering from emotional distress which is or has been marked by lack of focus and mental errors
in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and
feelings of agitation, and irritability.

### *Mary Dailey*

98.     Plaintiff Mary Dailey ("**Dailey**") worked for Syneos for 10 months and resides in Media, Pennsylvania. At the time of her termination, Dailey worked as a Sales Representative on the J&J contract. Dailey performed well in her role, was qualified for her job, and had a very good performance record.

99.     Dailey had no office to report to.  Her office was at her home.

100.    Dailey has sincere religious beliefs in conflict with the COVID-19 vaccine. Her Christian faith precludes her from receiving a vaccine that is tested on or developed using aborted fetal cell lines. In Dailey's personal system of religious beliefs, receiving a COVID-19 vaccine would be to condone abortion, a practice she vehemently objects to on religious grounds. Separate and distinct from her abortion-related objection, Dailey also is unable to receive a COVID-19 vaccine based on her religious belief that her body is the Temple of God. Dailey provided a detailed religious exemption request to Syneos describing the religious conflict.

101.    Because of her sincerely held religious beliefs, Dailey requested religious accommodation to the Mandate.  After Dailey submitted a religious exemption request outlining her religious conflict with the Mandate, Syneos reviewed her exemption request, verified the sincerity and religious nature of Dailey's beliefs in conflict with receiving a COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

102.    Syneos confirmed the religious sincerity of Dailey's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

103.     On December 9, 2021, Syneos reversed course and pretextually revoked the testing accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, continued telework, or any combination of these options.

104.     If it would have preserved her career, Dailey would have personally incurred any costs related to providing regular testing.

105.     Syneos refused to offer or otherwise provide these options because of Dailey's disfavored religious beliefs.

106.     Dailey was terminated because of her religious beliefs.

107.     The realized business costs of losing a productive employee like Dailey—e.g., recruiting, re-training, and various other business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate Dailey's religious beliefs.

108.     After discovering she was pregnant in December of 2021, Dailey also requested disability accommodations by way of a medical exemption to the Mandate. Syneos responded to Dailey's request by explicitly affirming the fact that she was medically incapable of receiving the COVID-19 vaccine, granted her medical exemption, but maintained it could not accommodate her beyond January 31, 2022.

109.     On January 11, 2021, Syneos e-mailed Dailey and stated "Your medical documentation notes pregnancy as the reason you are medically unable to be vaccinated. At this time, we are able to approve your request."

110.     Syneos also terminated Dailey on grounds of her pregnancy, a condition that Syneos acknowledged entitled her to a medical exemption and accommodation.

111.     Syneos did not engage with Dailey in any interactive process calculated towards finding a reasonable accommodation to her medical needs, and then terminated Dailey on January 31, 2022, despite several available options for reasonable accommodation.

112.     Dailey timely filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class wide claims.

113.     Syneos also terminated Dailey because her medical impairment precluded her from receiving a COVID-19 vaccine.

114.     When she was terminated, Dailey possessed natural immunity against COVID-19 through prior infection and recovery.

115.     As a direct and proximate cause of Syneos' discriminatory actions, Dailey's finances have been significantly and negatively impacted.

116.     In addition to financial loss, Dailey has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, and related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

117.     In addition to the above related to religious discrimination, Dailey has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to place her health and the health of her unborn child at risk. As a result of the discriminatory treatment she

23

experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Rebecca Husain*

118.    Plaintiff Rebecca Husain ("**Husain**") worked for Syneos for 11 years and resides in Glen Mills, Pennsylvania. At the time of her termination, Husain worked as an Executive Sales Representative on the J&J contract. Husain was a top performer, was qualified for her job, and had a very good performance record.

119.    Husain had no office to report to.  Her office was at her home.

120.    Husain has a documented medical history of severe allergic reactions to components of the COVID-19 vaccines, resulting in anaphylaxis. Husain has medical documentation substantiating her medical condition that goes back approximately 30 years.

121.    Syneos terminated Husain because of her medical impairment that Syneos explicitly acknowledged entitled her to a medical exemption and accommodation. Specifically, after Husian requested a medical exemption, Syneos emailed her on September 16, 2021 and stated "Your provider notes a documented allergy to a component of the vaccine as the reason you are medically unable to be vaccinated. Your exemption request has been approved."

122.    Husain's documented physical impairment, a known allergy to components of the COVID-19 vaccines, creates a substantial likelihood that receiving the vaccine would trigger her condition and impair almost every aspect of her life, including her ability to work.

123.    Because of her preexisting medical condition, Husain requested disability accommodations by way of a medical exemption to the Mandate. Syneos responded to Husain's

24

request by explicitly affirming the fact that she was medically incapable of receiving the COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

124.   On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, telework, or any combination of these options.

125.   When she was terminated, Husain possessed natural immunity against COVID-19 through prior infection and recovery.

126.   If it would have preserved her career, Husain would have personally incurred any costs related to providing regular testing.

127.   Syneos did not engage with Husain in any interactive process calculated towards finding a reasonable accommodation to her medical impairment.

128.   Syneos refused to offer or otherwise provide these options because of Husain's medical impairment and terminated Husain because of her medical impairment, which precluded her from receiving a COVID-19 vaccine.

129.   The realized business costs of losing a high-level employee like Husain—e.g., recruiting, re-training, and various other business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate Husain's medical impairment.

130.   Syneos terminated Husain on January 31, 2022.

131.    Husain timely filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class-wide claims.

132.    As a direct and proximate cause of Syneos' actions, Husain's finances have been significantly and negatively impacted.

133.    In addition to financial loss, Husain has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to place her health and life at risk, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Barbara Kaminski*

134.    Plaintiff Barbara Kaminski ("**Kaminski**") worked for Syneos for over 3 years and resides in Miller Place, New York. At the time of her termination, Kaminski worked as Senior Dental Sales Representative on a J&J contract. Kaminski performed well in her role, was qualified for her job, and Syneos recognized her award winning performance record.

135.    Kaminski had no office to report to.  Her office was at her home.

136.    Kaminski holds sincere religious beliefs in conflict with receiving a COVID-19 vaccine. Kaminski's Christian belief is that receiving a COVID-19 vaccine would demonstrate a lack of faith in God, as it alters God's design of her immune system—which is why she has never received a flu vaccine. On independent additional grounds, Kaminski's religious beliefs conflict with the COVID-19 vaccines' reliance on aborted fetal cell lines in their development and/or

26

testing. Kaminski provided a detailed religious exemption request to Syneos describing the religious conflict.

137.     Because of her sincerely held religious beliefs, Kaminski requested religious accommodation to the Mandate. After Kaminski submitted a religious exemption request outlining her religious conflict with the Mandate, Syneos reviewed her exemption request, verified the sincerity and religious nature of Kaminski's beliefs in conflict with receiving a COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

138.     Syneos confirmed the religious sincerity of Kaminski's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

139.     On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, telework, or any combination of these options.

140.     Syneos refused to offer or otherwise provide these options because of Kaminski's disfavored religious beliefs.

141.     When she was terminated, Kaminski possessed natural immunity against COVID-19 through prior infection and recovery.

142.     Syneos terminated Kaminski because of her disfavored religious beliefs.

27

143.    If it would have preserved her career, Kaminski would have personally incurred any costs related to providing regular testing.

144.    On December 25, 2021, Kaminski emailed Syneos' HR Department, challenging the revocation of her accommodation. Kaminski noted that all the dental offices she visited on her sales calls did not require the COVID-19 vaccine to enter the premises, which is because that there was no requirement in New York that dental offices require patients or office personnel to show proof of vaccination. As such, her vaccination status had no impact on her ability to perform the essential functions of her job. Kaminski further explained that her job never required her to visit Syneos' offices, outside of her initial on-boarding and training, which had already been completed.

145.    The realized business costs of losing a very productive and experienced employee like Kaminski—e.g., recruiting, re-training, and various other business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate Kaminski's religious beliefs.

146.    Syneos terminated Kaminski on January 31, 2022.

147.    Kaminski timely filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class-wide claims.

148.    As a direct and proximate cause of Syneos' discriminatory actions, Kaminski's finances have been significantly and negatively impacted.

149.    In addition to financial loss, Kaminski has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, and related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is

28

or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Andrew Smith*

150.    Plaintiff Andrew Smith ("**Smith**") worked for Syneos for over two years and resides in Weldon Spring, Missouri. At the time of his termination, Smith worked as a Sales Representative on the J&J contract. Smith performed well in his role, was qualified for his job, and had a very good performance record.

151.    Smith had no office to report to.  His office was at his home.

152.    Smith has sincere religious beliefs that prevent him from receiving a COVID-19 vaccine. Smith's Christian beliefs are that his body is the Temple of the Holy Spirit and that to protect it, he must reject the injection of foreign and unclean substances into his body. In his system of religious beliefs, Smith views the COVID-19 vaccines as containing unclean substances. Smith provided a detailed religious exemption request to Syneos describing the religious conflict.

153.    Because of his sincerely held religious beliefs, Smith requested religious accommodation to the Mandate. After Smith submitted a religious exemption request outlining his religious conflict with the Mandate, Syneos reviewed his exemption request, verified the sincerity and religious nature of Smith's beliefs in conflict with receiving a COVID-19 vaccine, granted his exemption, and provided the reasonable accommodation of COVID-19 testing.

154.    Syneos confirmed the religious sincerity of Smith's religious conflict with the Mandate, sending him an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

155.    On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, telework, or any combination of these options.

156.    Syneos refused to offer or otherwise provide these options because of Smith's disfavored religious beliefs.

157.    When he was terminated, Smith possessed natural immunity against COVID-19 through prior infection and recovery.

158.    Smith was terminated because of his religious beliefs.

159.    If it would have preserved his career, Smith would have personally incurred any costs related to providing regular testing results.

160.    Syneos terminated Smith on January 31, 2022.

161.    The realized business costs of losing a productive employee like Smith—*e.g.*, recruiting, re-training, and various other costs related to business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate his religious beliefs.

162.    Smith timely filed a Charge of Discrimination with the EEOC, subsequently amending his charge to include class-wide claims.

163.    As a direct and proximate cause of Syneos' discriminatory actions, Smith's finances have been significantly and negatively impacted.

164.    In addition to financial loss, Smith has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in

30

order to preserve his livelihood and career, and related to his unlawful termination. As a result of the discriminatory treatment he experienced, Smith is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Tanya Spurgeon*

165.    Plaintiff Tanya Spurgeon ("**Spurgeon**") worked for Syneos for over 5 years and resides in Cicero, Indiana. At the time of her termination, Spurgeon worked as an Immunology Sales Specialist on a J&J contract. Spurgeon was a top performer, was qualified for her job, and had a very good performance record, ranking in the top 10% of sales.

166.    Spurgeon had no office to report to.  Her office was at her home.

167.    Spurgeon holds sincere religious beliefs that prevent her from receiving a COVID-19 vaccine. Her Christian beliefs dictate that she must not condone abortion through receipt of the COVID-19 vaccines, which relied on aborted fetal cell lines in their testing and/or development. She also believes that God designed her body for His spirit, and that receiving a COVID-19 vaccine would demonstrate a lack of faith in God's design.  Spurgeon provided a detailed religious exemption request to Syneos describing the religious conflict.

168.     Because of her sincerely held religious beliefs, Spurgeon requested religious accommodation to the Mandate. After Spurgeon submitted a religious exemption request outlining her religious beliefs in conflict with the Mandate, Syneos reviewed her exemption request, verified the sincerity and religious nature of Spurgeon's beliefs, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

31

169.    Syneos confirmed the religious sincerity of Spurgeon's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

170.    On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, telework, or any combination of these options.

171.    Syneos refused to offer or otherwise provide these options because of Spurgeon's disfavored religious beliefs.

172.    Spurgeon was terminated because of her religious beliefs.

173.    If it would have preserved her career, Spurgeon would have personally incurred any costs related to providing regular testing results.

174.    On December 30, 2021, Spurgeon emailed HR challenging its assertion that accommodating her would constitute undue hardship. Spurgeon's email notes that no physicians' offices or hospitals required proof of vaccination for her to conduct sales calls. Thus, her vaccination status did not impact her ability to perform the essential functions of her job. In the same e-mail, Spurgeon highlighted that those individuals working for J&J, but effectively in the same job role as hers, were granted permanent exemptions from J&J without any undue hardship. Spurgeon's email also cites Abbott and AbbVie as other pharmaceutical companies granting permanent exemptions for individuals in nearly identical roles as hers. Lastly, Spurgeon's email

32

reminded Syneos of her natural immunity and proof of active COVID-19 antibodies at "379," thereby demonstrating Syneos could have accommodated her by simply maintaining the status quo and recognizing her natural immunity.

175.    Syneos terminated Spurgeon on January 31, 2022.

176.    The realized business costs of losing a very productive employee like Spurgeon— *e.g.*, recruiting, re-training, and various other costs related to business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate her religious beliefs.

177.    Spurgeon timely filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class-wide claims.

178.    As a direct and proximate cause of Syneos' discriminatory actions, Spurgeon's finances have been significantly and negatively impacted.

179.    In addition to financial loss, Spurgeon has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, all related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### *Jennifer Cipollino*

180.    Plaintiff Jennifer Cipollino ("**Cipollino**") worked for Syneos for over four years and resides in Northport, New York. At the time of her termination, Cipollino worked part-time as Sales Representative on the J&J contract. Cipollino performed well in her role, was qualified for her job, and had a very good performance record.

33

181. Cipollino had no office to report to. Her office was at her home.

182. Cipollino holds sincere religious beliefs that prevent her from receiving a COVID-19 vaccine. Cipollino's Christian beliefs are that vaccines represent "false idols" and contain impurities that "tamper with His holiness." Cipollino's faith requires her to maintain the holiness of her body as, in her system of religious beliefs, she views her body as made in the image of God and that receiving a COVID-19 vaccine would violate this image. Cipollino provided a detailed religious exemption request to Syneos describing the religious conflict.

183. Because of her sincerely held religious beliefs, Cipollino requested religious accommodation to the Mandate. After Cipollino submitted a religious exemption request outlining her religious conflict with the Mandate, Syneos reviewed her exemption request, verified the sincerity and religious nature of Cipollino's beliefs in conflict with receiving a COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

184. Syneos confirmed the religious sincerity of Cipollino's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

185. On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, telework, or any combination of these options.

34

186.     Syneos refused to offer or otherwise provide these options because of Cipollino's disfavored religious beliefs.

187.     When she was terminated, Cipollino possessed natural immunity against COVID-19 through prior infection and recovery.

188.     Cipollino was terminated because of her religious beliefs.

189.     If it would have preserved her career, Cipollino would have personally incurred any costs related to providing regular testing.

190.     Syneos terminated Cipollino on January 31, 2022.

191.     The realized business costs of losing a productive employee like Cipollino—*e.g.*, recruiting, re-training, and various other costs related to business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate her religious beliefs.

192.     Cipollino timely filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class-wide claims.

193.     As a direct and proximate cause of Syneos' discriminatory actions, Cipollino's finances have been significantly and negatively impacted.

194.     In addition to financial loss, Cipollino has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, and related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

35

*__Jill Roberts__*

195.    Plaintiff Jill Roberts ("**Roberts**") worked for Syneos for over five years and resides in Indian Land, South Carolina. At the time of her termination, Roberts worked as Senior Sales Representative. Roberts performed well in her role, was qualified for her job, and had a very good performance record.

196.    Roberts had no office to report to.  Her office was at her home.

197.    Roberts holds sincere religious beliefs that prevent her from receiving a COVID-19 vaccine. Roberts is compelled by her Christian beliefs to reject products that came to existence through reliance and dependence on abortion, including the mandated COVID-19 vaccines. On independent grounds, Roberts believes she must follow the direction of the Holy Spirit. Through prayer and reflection, Roberts came under conviction from the Holy Spirit to abstain from receiving a COVID-19 vaccine. Roberts provided a detailed religious exemption request to Syneos describing the religious conflict.

198.     Because of her sincerely held religious beliefs, Roberts requested a religious exemption and accommodation. After Roberts submitted a religious exemption request outlining her religious beliefs in conflict with the Mandate, Syneos reviewed her exemption request, verified the sincerity and religious nature of Roberts' beliefs in conflict with receiving a COVID-19 vaccine, granted her exemption, and provided the reasonable accommodation of COVID-19 testing.

199.    Syneos confirmed the religious sincerity of Robert's religious conflict with the Mandate, sending her an e-mail in September 2021 from the Leaves-US@syneoshealth.com e-

36

mail address which stated that "we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement."

200. On December 9, 2021, Syneos reversed course and pretextually revoked the accommodation, claiming undue hardship. Syneos did not address several alternative reasonable accommodations available, including but not limited to: recognition of natural immunity, continued testing (which was available for free throughout the country during the relevant timeframes), enhanced safety protocols, and telework.

201. Syneos refused to offer or otherwise provide these options because of Robert's disfavored religious beliefs.

202. When she was terminated, Roberts possessed natural immunity against COVID-19 through prior infection and recovery.

203. Roberts was terminated because of her religious beliefs.

204. If it would have preserved her career, Roberts would have personally incurred any costs related to providing regular testing.

205. Syneos terminated Roberts on January 31, 2022.

206. The realized business costs of losing a productive employee like Roberts—*e.g.*, recruiting, re-training, and various other costs related to business interruptions—were greater than any hypothetical costs Syneos would have incurred to accommodate her religious beliefs.

207. Roberts timely filed a Charge of Discrimination with the EEOC, subsequently amending her charge to include class-wide claims.

208. As a direct and proximate cause of Syneos' discriminatory actions, Roberts' finances have been significantly and negatively impacted.

37

209.     In addition to financial loss, Roberts has suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career, and related to her unlawful termination. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A. Syneos' COVID-19 Vaccination Mandate

210.     The Pfizer-BioNTech COVID-19 vaccine received Emergency Use Authorization on or around December 11, 2020. The Moderna and Johnson & Johnson COVID-19 vaccines soon thereafter also gained Emergency Use Authorization.

211.     Throughout 2020 and 2021, Syneos embraced the COVID-19 pandemic as an opportunity to transition its workforce towards a remote-work environment.  In its January 13, 2021 presentation, at the 39th Annual J.P. Morgan Healthcare Conference, Syneos touted "[h]elp[ing] customers navigate toward a **post-COVID virtual environment**" as one of its "2020 Highlights". *See* Excerpt of Syneos' Virtual Work Environment Presentation, attached hereto as "Exhibit 1" (emphasis added).

212.     As evidenced by publicly available earnings reports, for two years of the pandemic, Syneos operated its business with notable success and profitability without a fully vaccinated workforce.

213.     On September 2, 2021, Syneos instituted the Mandate, requiring all U.S. based employees to become fully vaccinated for COVID-19 as a condition of employment by October

38

22, 2021. *See Syneos Health US COVID-19 Vaccine Policy* (Sep. 2, 2021) (hereinafter, "**Policy Document**"). *See* Syneos' COVID-19 Policy Document, attached hereto as "Exhibit 2".

214. The Policy Document states:

> We have adopted this US COVID-19 Vaccine Policy ("Vaccine Policy") to continue that effort to safeguard the health of our employees and their families, our clients and business partners, and the community from COVID-19, which can be mitigated through an effective vaccination program. *Id.*

215. Despite approximately 58% of its workforce operating outside of the United States, Syneos only imposed the Mandate on its US-based employees.

216. In support of the Mandate, the Policy Document cites the Centers for Disease Control and Prevention ("**CDC**") and public health and licensing authorities as the basis for all guidance supporting the requirement.

217. The Mandate identified "Covered Workers" as:

> Associates and Associated Persons entering Company premises, meeting face to face, or otherwise coming into contact with other Associates, Associated Persons, clients, patients and healthcare providers and their staff in medical offices, investigative sites, or other medical settings, clinical trial sites, hospitals and similar health care environments. *Id.*

218. The Mandate defines "Associates and Associated Persons" as:

> all officers, directors, employees, and agents in the United States (collectively, "Associates") and to contractor labor, temporary employees, consultants and representatives (collectively "Associated Persons") in the United States. *Id.*

219. The Mandate dictated that "in order to enter our facilities or meet face to face with other Associates, Associated Persons, clients, patients or healthcare providers and their staff as described above, you must be Fully Vaccinated for COVID-19 by October 22, 2021." *Id.*

39

220.    The Mandate defined "Fully Vaccinated" as two weeks after an employee receive his/her final vaccine injection and any required boosters. *Id.*

221.    The Mandate stated, "Intentional non-compliance with this policy or providing false or misleading information to support an exemption request may result in disciplinary action up to and including termination of employment." *Id.*

222.    Upon information and belief, however, Syneos did not take any measure to ensure the authenticity of the submitted vaccination cards.

223.    On belief, there were Syneos' employees (including those denied religious and medical accommodations) who obtained fake vaccination cards instead of actually injecting any of the mandated vaccines into their bodies.

224.    Despite awareness that fake vaccination cards could and would be utilized to circumvent the Mandate, Syneos provided no means of confirming the validity of the submitted proof of vaccination. Syneos had reason to believe employees (including those denied religious and medical accommodations) obtained fake vaccination cards instead of actually receiving the mandated vaccines.

225.    Syneos also did not conduct antibody testing of its vaccinated employees to ensure that the vaccine prompted an antibody response. As a company with experienced and hyper-specialized knowledge in the biopharmaceutical space, Syneos is well aware that the effectiveness of vaccines vary from person to person, and if there is a limited antibody response in a person, that the vaccine provides corresponding and relatively less protection.

40

226.     Syneos allowed employees to satisfy its vaccination requirement through simply presenting a vaccination card, which are easily faked, and a method which in and of itself obviously does not demonstrate proof of active antibodies.

227.     Syneos' *U.S.-based Syneos Health Employees Frequently Asked Questions: U.S. COVID-19 Vaccine Policy* document ("**Vaccine FAQ**") states, "We believe vaccines are **safe** and the **most effective** public health tool to combat this global pandemic." *See* Syneos' COVID-19 FAQ, attached hereto as "Exhibit 3" (Emphasis added).

228.     The Vaccine FAQ states:

> The new policy requires vaccination in the following situations: 1. Employees entering a Syneos Health location – office, lab, or clinic – or attending a Syneos Health event (whether on or off-site). 2. Employees meeting face-to-face (F2F) with clients, patients, clinical trial investigators, and healthcare practitioners. *Id.*

229.     Regarding those with infrequent in-person meetings or events, the Vaccine FAQ specifically states that "[e]ach Business Unit (BU) leader will determine the specific roles or situations, within the BU, that must meet this requirement". *Id.*

230.     Contrary to the Policy Document, Plaintiffs Sellers and O'Callaghan, BU leaders, were not afforded any discretion to determine whether her team members would be required to meet the vaccination requirement.

231.     On information and belief, no BU leaders were afforded any discretion over whether employees would be subject to the Mandate, or whether religious and medically impaired employees could be reasonably accommodated. Instead, Syneos made a corporate-wide decision that the Mandate applied to virtually all roles, and that it could not accommodate any employees for any appreciable amount of time.

41

232.     Syneos instituted and implemented the Mandate from its corporate headquarters in Morrisville, North Carolina. Managers outside of the corporate headquarters lacked discretionary power to deviate from Syneos' standardized corporate policy, or how it was to be applied against employees with medical or religious objections to the compulsory vaccination policy.

233.     Regarding the vaccination requirement for employees "meeting face-to-face (F2F) with clients, patients, clinical trial investigators, and healthcare practitioners," this was a self-imposed requirement (and resulting hardship) that the overwhelming majority of Syneos' clients, patients, clinical trial investigators, and healthcare practitioners did not require, or if they did, allowed for exceptions which Plaintiffs and those similarly situated could have easily attained.

234.     Speaking to religious and disability accommodations, the Vaccine FAQ states:

> For qualifying employees with an exemption to the vaccine, accommodations will be determined on an **individual basis** through an interactive process. Specific accommodations may include the use of enhanced Personal Protection Equipment (PPE) or respirators, COVID-19 testing, changes to work schedules, job tasks and/or work environments. Decisions will be communicated directly to the requesting employee. *Id.* (Emphasis added).

235.     Pursuant to the policy announced in the FAQ, after conducting a review of medical exemption requests to the Mandate on an "individual basis," Syneos determined hundreds of employees possessed medical impairments entitling them to an ADA qualifying accommodation. *Id.*

236.     Pursuant to the policy announced in the FAQ, after conducting a review of religious exemption requests to the Mandate on an "individual basis," Syneos determined hundreds of employees possessed sincere religious beliefs entitling them to an accommodation under Title VII. *Id.*

42

237.    The Vaccine FAQ also confirms that vaccinated employees were required to report COVID-19 infection and exposure, stating, "Contact tracing and reporting remains a critical part of our safety protocol to ensure the well-being and protection of our employees." *Id.*

238.    Regarding "antibodies" for COVID-19 (*i.e.*, "natural immunity") Syneos conceded in the Vaccine FAQ that "antibodies from natural infection may provide some level of protection." *Id.*

239.    On information and belief, many employees requested that natural immunity be accepted as satisfying the Mandate, or be recognized as an accommodation to the compelled vaccination policy.

240.    Syneos made the corporate, company-wide decision to refuse to acknowledge immunization acquired through prior infection as satisfying the company's mandatory immunization requirement,

241.    Further, Syneos made the corporate, company-wide decision to refuse to permit proof of natural immunity as reasonable accommodation under the ADA and Title VII.

242.    Many unvaccinated employees and putative class members who possessed natural immunity when terminated did not bother requesting that their natural immunity be recognized as satisfying the Mandate or request it be recognized as a qualifying accommodation because they were informed that Syneos would not entertain any such requests. Had Syneos recognized natural immunity, these terminated employees would have communicated their natural immunity to Syneos in order to preserve their careers.

243.    Had Syneos recognized natural immunity as satisfying the Mandate's immunization requirements, or offered it as a reasonable accommodation, the company would

43

have been unable to effectuate its desired outcome: to purge as many religious and disabled employees as it possibly could.

244.     Plaintiffs O'Callaghan, Slagle, Husain, Sellers, Dailey, Spurgeon, Cipollino, and Morris had all been immunized naturally through prior COVID-19 infection.  This is a fact Syneos had actual and/or constructive knowledge of on the date it terminated their employment.

245.     For those seeking reasonable accommodation, the Policy Document states:

> [A]ny Associate who has a disability, who has a qualifying medical condition that contraindicates the vaccination, or who objects to being vaccinated on the basis of sincerely held religious beliefs and practices, the Company will engage in an interactive process to determine if a reasonable accommodation can be provided without creating an undue hardship for the Company and without posing a direct threat to the health or safety of others in the workplace and/or to the Associate. Pregnant or nursing mothers who are concerned about receiving their vaccinations during their pregnancy or during the time they are nursing should speak to their physician about their circumstances and may, if appropriate, seek a medical accommodation. *See* Exhibit 2 at p. 3.

246.     The Policy Document linked to forms for religious and medical exemption requests, and designated Leaves-US@syneoshealth.com as the address for all exemption requests to be submitted "as soon as possible." *Id.*

247.     Per the Policy Document, any questions relating to the Mandate were directed to HREmployeeRelations@syneoshealth.com.

248.     Syneos later set a submission deadline of September 16, 2021, for all requests, but continued to accept requests after this date.

44

## B. The Accommodations Process

### i. *Plaintiffs Apply for Religious and Disability Accommodation to the Mandate*

249.    Plaintiffs O'Callaghan, Dailey, Kaminski, Slagle, Roberts, Spurgeon, Cipollino, Smith, and Morris ("**Religious Plaintiffs**") all have sincere religious beliefs that prevent them from receiving a COVID-19 vaccine.  After reviewing these Plaintiffs' religious exemption requests, Syneos verified the sincerity and religious nature of their beliefs precluding them from receiving a COVID-19 vaccine.

250.    Religious Plaintiffs all submitted requests for religious accommodation to the Mandate.

251.    Multiple Religious Plaintiffs hold to the sincere religious belief that the human body is God's temple and that they must not take anything into their body that God has forbidden or that would alter the function of their body in a manner contemplated by the COVID-19 vaccine, which in their system of religious beliefs would violate God's design for their bodies.

252.    Multiple Religious Plaintiffs hold the sincere religious belief that the receipt of any vaccine is a lack of faith in God's design for the immune system and is therefore sinful.

253.    Multiple Religious Plaintiffs hold the sincere religious belief that the receipt of a product that has known risks of harm to the body, *i.e.*, God's temple, would result in a knowing disrespect for God's temple and would therefore be a sin to receive it.

254.    Multiple Religious Plaintiffs hold the sincere religious belief that they cannot inject spiritually unclean substances into their body, particularly those harmful substances such as chemicals or neurotoxins, as this would defile their body as God's temple.

45

255.     Multiple Religious Plaintiffs hold sincere religious objections to abortion, and therefore are unable to receive the COVID-19 vaccines because the mandated vaccines were either tested on or developed using aborted fetal cell lines.

256.     Multiple Religious Plaintiffs hold the sincere religious belief that receiving the COVID-19 vaccine would be an endorsement and worship of false idols, in conflict with God's teachings.

257.     Multiple Religious Plaintiffs' sincere religious beliefs include adhering to the Holy Spirit's guidance, obtained through prayer, in making life decisions. Several Religious Plaintiffs prayed for guidance on the issue of COVID-19 vaccines and came under firm religious conviction that they must abstain from receiving a COVID-19 vaccine.

258.     Syneos explicitly acknowledged the sincerity and religious nature of the Religious Plaintiffs' beliefs and, consistent with Title VII and the ADA's requirements, provided accommodations. However, these accommodations were temporary.

259.     Plaintiffs Dailey, Husain, Sellers, and Slagle ("**Disability Plaintiffs**") all submitted requests for accommodation to the Mandate based on their medical impairments.

260.     Each of the Disability Plaintiffs, and those similarly situated, submitted a medical exemption request form, each outlining their documented medical condition preventing them from receiving any of the COVID-19 vaccines.

261.     Per Syneos' instructions, the medical exemption requests were sent to Leaves-US@syneoshealth.com.

262.     Plaintiff Sellers submitted a medical exemption containing supporting documentation from her medical provider of her severe allergic reaction to the first dose of the

46

Pfizer-BioNTech vaccine. Sellers' acute symptoms (within the first 24 hours after vaccination) included severe diarrhea, severe body aches, chills, severe headache, chest pain and burning, a fever of 101 degrees, and vomiting. Long-term, Sellers suffered ongoing hair loss, Herpes zoster, and "frozen shoulders" in both arms, a known auto-immune condition.

263.    Plaintiff Husain submitted a medical exemption request containing medical documentation of her history of anaphylaxis due to certain components of the COVID-19 vaccines. Husain provided medical documentation from her provider substantiating her medical condition that precludes her from receiving a COVID-19 vaccine.

264.    Plaintiff Slagle submitted a medical exemption request outlining her pre-existing medical condition of mitral valve prolapse disease, a documented condition dating back to 2016. Slagle provided supporting documentation from her medical provider.

265.    Plaintiff Dailey submitted a medical exemption request due to her pregnancy, which Syneos acknowledged entitled her to a medical exemption.

### ii.    *Syneos Initially Accommodates 549 out of 628 Requests for Accommodation*

266.    Beginning on September 2, 2021, Syneos evaluated approximately 628 exemption requests for religious and medical exemption to the Mandate.

267.    During this process, Syneos conducted a review of religious exemption requests and made a determination regarding the religious sincerity of each employee's request.

268.    During this process, Syneos conducted a review of medical exemption requests and made a determination regarding whether each employee was or was not entitled to a medical exemption.

47

269.   Of the approximately 628 requests, Syneos determined that 79 requests either: (1) did not present sincere religious beliefs entitling the employee to protection under Title VII; or (2) failed to present a medical condition that would qualify for a disability-based accommodation under the ADA.

270.   Syneos employs approximately 14,000 people in the United States, meaning with 628 requests, approximately 4.5% of its employees sought accommodation to the Mandate.

271.   Of its approximately 14,000 employees, roughly 3.9% were found to qualify for a reasonable accommodation under either the ADA or Title VII.

### iii.   Syneos Reverses Course and Strips Previously Provided Accommodations

272.   At some point between September 2, 2021, and September 16, 2021, former District Sales Manager, Greg Burlin, who interacted regularly with upper management, signaled to Plaintiff Kaminski that she needed to prepare herself because "serious sh*t was going down" for employees who remained unvaccinated and out of compliance with the Mandate.

273.   At this time, Syneos' internal records demonstrated that almost all of its unvaccinated workforce was out of compliance with the Mandate for religious reasons or due to medical impairments.

274.   During the same time frame, Burlin indicated to another unvaccinated employee that things were about to get "much harder" for unvaccinated employees (the overwhelming majority of whom possessed religious or disability-based objections to receiving a vaccine).

275.   On or around September 16, 2021, Syneos sent a form email to Plaintiffs and others similarly situated, acknowledging either the sincerity of their religious beliefs, or the validity of their stated disability in their respective requests for accommodation.

48

276. The emails were sent from [Leaves-US@syneoshealth.com](mailto:Leaves-US@syneoshealth.com).

277. For the Religious Plaintiffs and those similarly situated, the email stated:

> This email is in regards to your current exemption request. Based on your submission, **we have concluded you have a sincerely-held religious belief that would exempt you from the vaccination requirement.** Human Resources will partner with your Business Unit to determine if we can provide an accommodation without creating an undue hardship on the Company. *See* Exhibit 4, Standard Religious Exemption Verification E-mail (Emphasis added).

278. For the Disability Plaintiffs,[3] the R/A Disability Plaintiffs, and those similarly situated, the email stated:

> This email is in regards to your current exemption request. **Your provider notes a documented allergy to a component of the vaccine as the reason you are medically unable to be vaccinated. Your exemption request has been approved**. Human resources will partner with your Business Unit to determine if we can provide a temporary accommodation without creating an undue hardship on the Company. *See* Exhibit 5, Standard Medical Exemption Verification E-mail (Emphasis added).

279. On October 29, 2021, Syneos sent another uniform email to employees on certain contracts (who had submitted exemption requests) indicating that they had been granted a reasonable accommodation of polymerase chain reaction ("**PCR**") testing. Employees were to not upload their actual test results, but only the date of the test and an attestation of their test result to the existing MyESS system, beginning November 1, 2021. Employees were told to keep records of their testing to be available upon request.

---

[3] Some Plaintiffs and other employees similarly situated submitted their medical exemption requests at a later date, but nevertheless received this same email in response.

280.    On information and belief, Syneos never required any employee to supply documentation of prior testing.

281.    In the October 29th email, Syneos specifically references and encourages its accommodated employees to "use free testing options where available." The email also states that Line Managers would be responsible for monitoring MyESS to ensure compliance of all their representatives in submitting their attestations.

282.    On November 5, 2021, Syneos revised the accommodation to allow for at-home rapid testing and only required tests prior to in-person meetings.

283.    During the relevant time frame, Plaintiffs and those similarly situated were not prevented from conducting sales calls due to their vaccination status and were not asked and/or required by clients or prospective clients to produce a negative test result in order to conduct sales calls. In the event such a requirement existed, Plaintiffs and those similarly situated could and would have easily provided negative tests to fulfill their job duties (free testing was available throughout the country at all relevant times).

284.    On December 9, 2021, Syneos made a corporate-wide decision to revoke virtually all grants of religious and disability accommodation relating to the Mandate and sent out a uniform letter to employees it had previously accommodated (the "**Revocation Letter**"). *See* Exhibit 6, Syneos Reasonable Accommodation Revocation Letter to Plaintiff Barbara Kaminski. The revocation came through a standardized letter from Nicole Blum, Director of HR, jointly notifying both religious and disabled employees who had previously been afforded accommodations that the company would no longer afford accommodations and that if they failed to become vaccinated, unvaccinated employees would shortly thereafter be terminated.

50

285. The Revocation Letter did not distinguish between religious or disability accommodations and contained no individualized information (aside from the employee's name in the salutation). Plaintiffs and those similarly situated received the Revocation Letter, each with the file name "(Non-Florida)_Business_as_Usual_with_1.31_Term_Date.pdf".

286. As the file name suggests, Syneos did not revoke accommodations for its Florida employees.

287. Syneos made the determination it could accommodate its Florida-based employees without undue hardship.

288. Syneos similarly could have accommodated its non-Florida-based employees without any hardship or with minimal and/or no-cost whatsoever to the company.

289. On information and belief, the overwhelming majority of Syneos' employees previously afforded accommodations to the Mandate received the Revocation Letter.

290. The Revocation Letter states:

> This email is regarding Syneos Health's mandatory vaccination policy and the accommodation that we are able to grant you, at this time, as a result of your exemption request. Based on your role, the needs of the business, and client demands as they currently exist, you are receiving a temporary accommodation through January 31, 2022, where you will perform your normal job duties under the guidance of your line manager. Due to the requirements of your current role, which has extensive in-person contact, it has been determined that following your temporary accommodation period, you will not be able to adequately perform the essential functions of your role without posing an undue hardship on Syneos Health if you remain unvaccinated. As a result, if you are unable to find another opportunity within the Company where you meet the qualifications and can perform the essential functions of the role with or without a reasonable accommodation that does not cause an undue hardship on Syneos, your employment

51

with Syneos Health will be separated on January 31, 2022. *Id.*

291. Syneos did not perform an individualized assessment of the religious and medically impaired employees it had previously accommodated to determine whether it could have continued to provide accommodations. Rather, Syneos made a blanket decision that it would terminate most, if not all, employees who possessed religious objections to receiving a COVID-19 vaccine, or medical impairments that precluded COVID-19 vaccination, regardless of Syneos' actual ability to provide a reasonable accommodation for each employee.

292. When it issued the Revocation Letter, Syneos knew precisely how many religious and medically impaired employees its changed accommodation policy would negatively impact.

293. Syneos had almost three months to explore all options to accommodate Religious and Disabled Plaintiffs (and those similarly situated) prior to its Revocation Letter.

294. At the time of its Revocation Letter, through its contact tracing protocols, Syneos knew or should have known that a large percentage of its unvaccinated workforce had been immunized naturally through prior infection.

295. On information and belief, at the time of the Revocation Letter, Syneos knew or should have known that its vaccinated employees were contracting COVID-19 at higher rates than unvaccinated employees, especially those who had been immunized naturally through prior infection.

296. Syneos knew or should have known that a large percentage of the employees affected by the December 9, 2021 revocation could have been accommodated through recognition of natural immunity at no-cost to Syneos.

52

297.    Syneos granted temporary accommodations, not because it was committed to complying with the law, but rather as a pretextual legal strategy to lay a foundation needed to manufacture an "undue hardship" defense for purported testing costs.

298.    However, at the time of the Revocation Letter, Syneos knew or should have known that no-cost testing options were available and/or that Religious and Disability Plaintiffs would cover any additional cost for testing and/or other available accommodation options.

299.    At the time of the Revocation Letter, Syneos knew or should have known that a negligible number of clients and/or prospective clients were requiring proof of vaccination to conduct sales calls and that it could have easily assigned vaccinated employees (who comprised 90-95% of the company's workforce) to conduct such calls as needed with little or no cost to the company.

300.    Syneos set a revised deadline of January 14, 2022, for all those who were previously granted accommodations to receive the COVID-19 vaccine.

301.    Syneos informed employees that if they remained unvaccinated past January 14, 2022, they would be terminated on January 31, 2022.

302.    Leading up to the mass termination, Syneos trumpeted its disregard of its obligations under the ADA and Title VII. On January 21, 2022, a top Syneos' manager, Christy Cannon, stated in a PowerPoint Presentation that as of February 1, 2022, the company was "proud to announce" that it had a 100% compliance rate for the Mandate, and several Plaintiffs were present for this presentation. Apparently, there was not a single unvaccinated employee that Syneos was able to accommodate, and Syneos was proud of that fact.

53

303.    Plaintiffs and those similarly situated all were terminated by Syneos on January 31, 2022.

C.  **Plaintiffs Seek Alternate Roles and Appeal the Accommodation Revocation**

304.    Syneos' Revocation Letter implied there were job opportunities available that did not require vaccination, however these 'options' were entirely illusory and the company had no intention to allow its religious and medically impaired employees to transfer jobs.

305.    The same day as the Revocation E-mail, National Business Director Pat Sheehan e-mailed upper management and instructed them to avoid "offering false hope [to unvaccinated employees] about some alternate decision or ability to secure an alternate internal position."

306.    Several Plaintiffs communicated with Syneos about open job opportunities that did not require vaccination. Syneos was nonresponsive to these inquiries.

307.    Several Plaintiffs attempted to apply internally for positions but were prevented from doing so because the application process screened out anyone who had not received the COVID-19 vaccine.

308.    Despite Syneos implying there were available other positions for unvaccinated employees, these roles were non-existent or were entirely illusory, unavailable to Plaintiffs or those similarly situated.

309.    Between December 9, 2021, and January 14, 2022, several Plaintiffs received notice from other Syneos employees, that their current positions were listed on recruitment sites as available job openings at Syneos. When Plaintiffs spoke with their respective managers to confirm, the managers stated that Syneos had made a corporate decision, directing management to

54

begin hiring for the roles that were currently occupied by the religious and disabled employees unable to receive a COVID-19 vaccine.

310. The language in Syneos' job postings during the relevant timeframes makes clear Syneos also had no intention of affording religious or disability accommodation to new hires, exemplifying the clear corporate policy to ignore individualized circumstances for prospective religious and disabled employees unable to receive the COVID-19 vaccine. A sample job posting is provided below:

> IMPORTANT: I understand that if the role for which I am applying requires extensive in-person contact with colleagues, health care providers, clients and other medical professionals who have stringent vaccination requirements that all Syneos Health employees with whom they partner be fully vaccinated and will not accept or consider any exemptions. I understand I can request an exemption from Syneos Health's vaccination requirement based on a qualifying medical condition or sincerely held religious belief. **However, in the event that I successfully obtain an exemption, I understand that it is highly unlikely that I will be able to adequately perform the essential functions of this position without imposing an undue hardship on Syneos Health due to the clients' demands**. (Emphasis added).

311. On January 21, 2022, Plaintiff Spurgeon again emailed Sandy Espinoza, HR, asking why Syneos was stating it would allow for religious accommodation in the job posting replacing her job if they were unable to provide an accommodation. Spurgeon also inquired into whether she was being blocked from other roles within the company.

312. Espinoza replied to the email same day, thanking Spurgeon for notice of the job posting but not providing further explanation. In response to other roles, Espinoza stated, "This mandate applies to most jobs, if you don't meet the qualifications, you will not be able to apply to other roles. You will need to contact the recruiter to ask which roles you do qualify for."

55

313.    Moreover, Syneos misrepresented the fact that its Florida employees would be exempted from the vaccination requirement and in so doing caused other Syneos employees to refrain from applying to open jobs in Florida.  Plaintiff Roberts (a South Carolina-based employee) showed interest in applying for a job in Florida (in order to salvage her career, she was willing to move).  However, her district manager Lisa Chascsa and regional manager Martin Mayer indicated that Florida residents would <u>not</u> be exempt from the vaccine mandate.  Consequently, because of the representations made by Ms. Chasca and Mr. Mayer, and because her religious beliefs prevented her from receiving a COVID-19 vaccine, Plaintiff Roberts did not apply for the Florida job. Ms. Chasca and Mr. Mayer's misrepresentations were in furtherance of Syneos' corporate policy to discourage and eliminate as many religious and disabled employees as possible, using the Mandate as its weapon of choice.

314.    All Plaintiffs either communicated their willingness to pay for costs associated with accommodation to Syneos or would have personally paid the costs associated with accommodation had Syneos given them the option.

315.    On information and belief, unvaccinated employees due to be terminated offered to pay for any all costs associated with testing, and informed Syneos that they would be willing to accept and comply with *any* accommodation option Syneos offered.

316.    Many Plaintiffs and other similarly situated employees sought to engage in an ongoing interactive process calculated towards finding a reasonable accommodation that would not cause the company a purported undue hardship.

56

317.    Syneos replied with boilerplate responses, affirming its "no accommodation" policy, offering no alternative accommodation options, and providing no explanation for why it was revoking the regular testing accommodation.

318.    For example, on December 30, 2021, after her previous testing accommodation had been revoked, Plaintiff Slagle e-mailed Syneos' HR Department and asked "Will you allow me to personally pay for any and all testing, supplies (PPE) or hardship?" In the same e-mail, Slagle also asked "Why was I never given the option or opportunity to personally incur any and all financial hardship that my being unvaccinated might pose to the company?" Slagle also asked how her job required extensive "in-person contact" considering she was a 100% remote worker and had never once been required as a Field Talent Manager to go into the field or leave her home. *See* Exhibit 7, Plaintiff Slagle E-mail Excerpt Challenging Syneos' Bad Faith Accommodations Process.

319.    Syneos did not respond to Slagle's questions or requests for clarification.

320.    On information and belief, Syneos' corporate protocol, instituted with the intent to rid itself of as many religious and disabled employees as possible, was to refrain from engaging in substantive discussion when presented with questions like Slagle's (to which there was no legally defensible answers).

321.    The job roles for Plaintiffs and those similarly situated did not change during the pandemic and did not change before or after the Mandate was instituted. Plaintiffs and those similarly situated were able to fullfill the core functions of their jobs both before and after the Mandate was instituted.

322.    Thus, the only purported hardship Synoes confronted, with regard to Plaintiffs and those similarly situated after the Mandate was instituted, was a burden that it placed on itself.

57

### D. Coercion and Harassment of Plaintiffs During the Relevant Period

323. Beginning in early 2021, Syneos began pressuring its employees to receive the COVID-19 vaccine.

324. Certain managers—like Plaintiff Husain's manager (Baron)—harassed those with known medical impairments in conflict with the COVID-19 vaccines. On or around January 15, 2021, Baron scheduled a phone call with Husain to discuss Q4 2020 performance (Husain ranked among the top sales reps in the nation). Baron asked Husain her intentions surrounding the COVID-19 vaccine, to which Husain indicated that due to her history of anaphylaxis, she could not receive a COVID-19 vaccine. Baron nevertheless responded saying, "I think you should take it."

325. Subsequently, Baron began to single-out each team member during conference calls, asking whether he/she had researched on where to get the COVID-19 vaccine. After being made aware of Husain's existing medical condition, Baron continued to apply extreme pressure on Husain to receive the vaccine, saying things like "it is our social impetus to take the vaccine" and that "even the Pope is an advocate of the vaccine." Calls from Baron often lasted an hour or longer, in which she continually pressured Husain to submit to the Mandate.

326. During team teleconferences, Plaintiff Kaminski was bullied and ostracized regularly for declining to become vaccinated. Specifically, Marc Garcia went so far as to say, "just do it—give them the arm Barbara, turn your head back." This statement came after Kaminski had requested religious accommodation.

327. Plaintiffs were constantly bombarded with messaging to receive the COVID-19 vaccine, even after submitting their respective religious or medical exemption requests.

58

328.     On information and belief, Syneos' upper management knew of the hostile culture towards the unvaccinated with religious and medical conflicts to the vaccine, but did nothing to prevent the continued hostility and harassment. In this regard, middle and lower managers were simply acting upon a corporate-devised strategy to coerce and eliminate as many religious and disabled employees as possible.

329.     On information and belief, several employees abandoned their sincere religious religious beliefs after being coerced into receiving the COVID-19 vaccine after having their accommodations revoked. These employees chose to provide for their families (a core principle pf many religios belief systems) over preserving their religious objections to vaccination.

E.  **Syneos' Inauthentic Assertions of Undue Hardship and Pretextual Justifications for the Mandate**

i.   *No Individualized Assessment for Reasonable Accommodation Options*

330.     As a corporate, nationwide policy, Syneos willfully pre-determined that it would not perform individualized assessments of each unvaccinated employee's specific circumstances to determine whether a reasonable accommodation option was available. Syneos did not conduct individualized assessment for reasonable accommodation to any Plaintiff or those similarly situated.

331.     On information and belief, Syneos' temporary grant of accommodations was in bad faith, and simply a legal maneuver to posture against future liability. Syneos, despite knowing the impact on religious and disabled individuals, purposefully conducted an illusory accommodations process. Syneos knew in advance it would not accommodate, and that it would either pressure religious and disabled individuals into receiving the vaccine or would ultimately terminate them for noncompliance with the Mandate.

59

332.     Syneos could have accommodated Plaintiffs and those similarly situated without any hardship whatsoever through, among other available options: (1) recognizing natural immunity to COVID-19 (where applicable); (2) telework (even if on a temporary basis until the COVID-19 threat subsided); (3) enhanced safety protocols for face-to-face meetings with Syneos employees or clients; (4) periodic negative COVID-19 tests (which were available for free or could have been paid for by Plaintiffs); or (5) any combination of the above options.

333.     Syneos encouraged liberal telework policies during the relevant timeframes and continues to this day to permit telework for employees whose job descriptions require more in-person contact than the job descriptions of Plaintiffs and those similarly situated.

334.     Syneos claims of administrative and financial burden related to providing a testing option to religious and disabled employees demonstrates pretext. Throughout the country during the relevant timeframes, both state and federal governments offered free testing options, and unvaccinated religious and medically vulnerable employees pleaded with Syneos to allow them to personally incur testing costs in an effort to preserve their livelihoods. Syneos refused their requests.

335.     Moreover, Syneos' own business records related to the relative infection rates between its vaccinated and unvaccinated workforce also demonstrate pretext. As a federal contractor, Syneos adhered to strict contact tracing requirements throughout the pandemic. Those records will show Syneos knew at the time it revoked accommodations and certainly when it terminated Plaintiffs and those similarly situated that its vaccinated employees were contracting and spreading COVID-19 at the same, similar, or likely even higher rates relative to its unvaccinated employees.

60

336.    On information, vaccinated employees were reporting COVID-19 infections at dramatically higher rates than unvaccinated employees. Despite actual knowledge of transmission risk amongst its vaccinated employees, Syneos stopped its contact tracing for COVID-19 infections upon terminating Plaintiffs and those similarly situated. In short, Syneos was not as concerned about "workplace safety" as it will soon represent, but rather was driven by a desire to rid itself of as many religious and disabled employees as it possibly could. Syneos utilized the Mandate as a convenient vehicle to accomplish its unlawful agenda.

337.    Considering that multiple accommodation options were available that would have imposed less than a *de minimis* burden, and the inauthenticity of its undue hardship assertions, Syneos acted with malice and recklessly disregarded Plaintiffs and those similarly situated rights under the ADA and Title VII.

### ii.    *Florida Employees Were Accommodated*

338.    Despite having the same or virtually identical job roles and duties as Plaintiffs and those similarly situated, unvaccinated employees residing in Florida did not have their accommodations revoked. Syneos provided accommodations to its religious and medically impaired employees in Florida. Moreover, Florida employees hired during the relevant timeframe were able to work without proof of vaccination.

339.    On information and belief, Syneos accommodated unvaccinated Florida employees without requiring regular testing. Florida employees were able to conduct their job duties without additional safety restrictions.

340.    Functionally, Syneos accommodated unvaccinated Florida-based employees in substantially equivalent jobs descriptions as Plaintiffs and those similarly situated.

61

### iii. *Very Few if Any Clients or Prospective Clients Required Proof of COVID-19 Vaccination or Proof of Negative COVID-19 Test*

341.    On information and belief, contrary to Syneos' assertions utilized to justify the Mandate and its purported inability to accommodate its employees without undue hardship, very few, if any, "clients and other medical professionals" had "stringent vaccination requirements."

342.    For those medical professionals and clients that did have such requirements, vaccinated employees—who comprised approximately 90% to 95% of Syneos' workforce during relevant timeframes—could have been easily reassigned to service any medical professionals, clients, and prospective clients with minimal cost and/or no cost to the company.

343.    No Plaintiff was denied access to visit clients or prospective clients for sales meetings due to his or her vaccination status.

### iv. *Virtually Identical Client-Employed Roles Were Accommodated Without Hardship*

344.    Regular PCR testing as an accommodation has been adopted by corporations across the country, an option that could have been seamlessly implemented for employees lacking natural immunity. In fact, Syneos' own clients, Johnson & Johnson ("**J&J**") and GlascoSmithKline ("**GSK**") accommodated employees seeking religious or disability-based accommodations to its COVID-19 vaccine requirement through regular testing. Like most all employers across the country who exercised rational business sense, J&J and GSK were able to preserve the employment of its religious and disabled employees while simultaneously advancing its health and safety goals.

345.    Notably, J&J and GSK have employees in virtually identical roles as Plaintiffs.

62

346.    In fact, upon information and belief, many of the religious and disabled employees Syneos terminated due to noncompliance with the Mandate thereafter gained employment with J&J and GSK, who provided reasonable accommodations in compliance with Title VII and the ADA's requirements.

### v.    *Syneos Did Not Confirm Validity of Those Claiming to be Vaccinated*

347.    On information and belief, Syneos did not vet employees who claimed to be fully vaccinated. On belief, many employees who claimed to be vaccinated against COVID-19 did not receive a COVID-19 vaccine.

348.    Syneos had actual and/or constructive knowledge that employees were submitting fake vaccination cards.

349.    Nonetheless, Syneos, while claiming the safety of its workforce depended on universal vaccination, did nothing to ensure employees were not submitting fake proof of vaccination.

350.    On information and belief, Syneos did not conduct antibody tests to confirm that those who received the vaccine actually elicited an immune response to COVID-19.

### vi.    *Free Testing was available throughout the Country*

351.    Syneos asserts in its EEOC Position Statement response to Plaintiff Morris' charge of discrimination that the cost of testing every unvaccinated employee justified its claims of undue hardship. However, free testing was available throughout the country during the relevant timeframes.

352.    In addition, several Plaintiffs notified Syneos that they would cover any testing costs associated with their respective accommodation.

63

353. All Plaintiffs maintain that if given the option to pay for their own testing costs, they would have done so.

354. As early as December 3, 2021, the White House had announced plans for full reimbursement of COVID-19 testing costs for employers.[4]

355. On January 10, 2022—prior to the mass termination—President Biden's Department of Health and Human Services ("**HHS**") announced that as of January 15, 2022, all health insurers would be required to cover the **full cost of at-home COVID-19 testing.** *See* U.S. Department of Health and Human Services Press Release, *available at* https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group-health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html (last visited June 5, 2023)

356. Prior to institution of the testing requirement for certain unvaccinated employees, employees in management roles kept record of all incidences of COVID-19 infection, and could have easily tracked testing requirements.

357. On information and belief, time spent tracking COVID-19 infections (and the attendant administrative burden), was overwhelmingly *attributed to vaccinated employees*. For example, Plaintiff Morris recorded only 2 incidences of COVID-19 infection on her team for unvaccinated employees, while recording approximately 20 incidences among vaccinated employees.

---

[4] *See* CNBC, *How to get the free at-home COVID tests promised by the White House,* (December 3, 2021) https://www.cnbc.com/2021/12/03/how-to-get-the-free-at-home-covid-tests-promised-by-white-house-.html (last accessed June 5, 2023).

358.     Thus, any purported administrative burden associated with tracking testing would be disproportionately associated with vaccinated employees.

359.     Syneos could have continued use of its existing MyESS software to track attestations of COVID-19 testing, an option that would have entailed little or no additional expense or administrative burden.

### vii.     *Favored Employees Were Accommodated, Regardless of Membership in a Protected Classification*

360.     Demonstrating it was able to accommodate without undue hardship, Syneos accommodated certain favored employees who occupied positions in close proximity to upper management.

361.     On information and belief, Syneos provided reasonable accommodations to certain favored unvaccinated employees in its corporate headquarters office, and other office locations throughout the country, irrespective of whether they actually possessed sincere religious beliefs or medical impairments that precluded them from receiving a COVID-19 vaccine.

362.     These unvaccinated employees were afforded favorable treatment not because of their religious beliefs or medical impairments, but because of their proximity to power. Top managers who possessed the authority to override Syneos' general company-wide "no accommodation" policy ensured that these favored employees kept their jobs.

363.     On information and belief, the select few favored unvaccinated employees who were permitted to continue working with reasonable accommodations had job descriptions that required significantly more in-person contact than did Plaintiffs' jobs.

364. At least some of these favored employees who managed to preserve employment had job descriptions that required them to report to an office and interface regularly with other Syneos' employees.

365. On information and belief, Ms. Christine O'Connell—whose job requires more in-person contact than Plaintiffs and those similarly situated—has been permitted to continue working while unvaccinated.

366. On information and belief, Ms. O'Connell was accommodated because her supervisor, Christy Cannon, intervened and ensured that Ms. O'Connell's employment was preserved, despite her non-compliance with the Mandate.

367. Syneos selectively provided reasonable accommodations to the Mandate for reasons unrelated to its obligations under Title VII and the ADA.

> viii. ***After Clear Signs of Vaccine Inefficacy, Syneos Recklessly Pursued Implementation of the Mandate, Pretextually Claiming that the Mandated Vaccines were "Effective"***

368. In justifying the Mandate, Syneos either strongly implied, or explicitly stated, that the available vaccines were 'effective' and the best and exclusive solution to ensure workplace safety. No alternatives for achieving its purported "workplace safety" goal were contemplated. Syneos selected the singular method to accomplish its goal—although many alternative methods were available—that eliminated hundreds of religious and medically impaired employees, during a labor shortage.

369. Moreover, by September 2021, and most certainly January 2022 when it executed its mass termination scheme, Syneos knew or should have known that the available COVID-19 vaccines did not prevent transmission or infection.

66

370.    At best, the mandated vaccines provide only an undefined level of personal protection, which Plaintiffs and those similarly situated gladly declined to uphold their religious convictions and/or to avoid exacerbating documented ADA qualifying medical conditions.

371.    On information and belief, Syneos' own business records will demonstrate that its vaccinated employees accounted for the strong majority of its recorded COVID-19 cases from May 2021 through January 2022.

372.    On information and belief, positive cases amongst vaccinated employees were also accounting for a similar or higher ratio of positive cases relative to unvaccinated employees, especially relative to unvaccinated employees who possessed natural immunity.

373.    Through its own business records, Syneos knew or should have known that the vaccine-based immunity was, at best, equal to natural immunity, and likely inferior.

374.    When instituting the Mandate, Syneos knew through its own records and internal tracking data that from September 2021 through January 2022, its vaccinated employees were contracting COVID-19 at the same, similar, or even greater rates than its unvaccinated employees, particularly relative to unvaccinated employees who possessed natural immunity through prior COVID-19 infection.

375.    Despite vaccinated employees accounting for the overwhelming majority of COVID-19 infections within its workforce during the relevant timeframes, Syneos stopped its contact tracing protocols for COVID-19 infection after executing its mass termination scheme on January 31, 2022. Thus, the "workplace safety" rationale was pretext, a convenient but provably false business justification utilized to rid itself of as many religious and medically impaired employees as possible.

67

376.     Months before Syneos instituted the Mandate, the CDC, other federal health agencies, and the international research community repeatedly confirmed that the COVID-19 vaccines did not prevent transmission or infection.

377.     As early as August 2021, the CDC recognized that the COVID-19 vaccines worked "with regard to severe illness and death… [b]ut what they c[ouldn]'t do anymore is prevent transmission." Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).

378.     In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed that vaccinated individuals have a 5% higher viral load than the unvaccinated and are not only just as likely to transmit the virus as the unvaccinated, but pose a greater contagion risk due to the increased likelihood of asymptomatic infection.[5]

379.     On January 19, 2022, the CDC published confirmation that natural immunity to COVID-19 affords superior protection and results in less hospitalizations than vaccination alone.[6] This announcement came 12 days before Syneos terminated Plaintiffs and members of the putative class.

380.     By January 2022, COVID-19 vaccines were clearly failing to protect against emerging variants, such as Delta and Omicron. At the time Syneos required vaccination, all

---

[5] *See* Kasen Riemersma, *et. al*, *Shedding of Infectious SARS-CoV-2 Despite Vaccination* medRxiv (August 24, 2021), *available at*  https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

[6] CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May–November 2021* ("**CDC Report**"), https://www.cdc.gov/mmwr/volumes /71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

68

available COVID-19 vaccines were still designed from the original ("Alpha") strain of the SARS-CoV-2 virus, while employees with prior infection had more robust and durable immunity against emerging variants.

381.    Publicly available research during the relevant timeframes showed, among other things, that: (1) the available vaccines did not prevent transmission of the disease, but could only (at best) reduce symptom severity; (2) vaccine antibody titers were waning soon after the second dose of either mRNA vaccine; (3) the available vaccines in many circumstances were demonstrating negative efficacy against the emerging variants; (4) the Delta and Omicron strains were showing resistance to the antibodies induced by the vaccines, explainable through mutations in the spike protein; and (5) natural immunity from COVID-19 through prior infection was demonstrating strong, durable, and *at least* equivalent (often greater) protection against COVID-19 than vaccination alone.

382.    Through its own business records and professional expertise in the pharmacological space, Syneos knew or should have known that the vaccine-based immunity was, at best, similar to the protection gained through natural infection, and knew or should have known vaccine-based immunity was likely inferior to natural immunity.

383.    This is because the international scientific community has conclusively established through centuries of research that natural immunity is superior to vaccine-elicited immunity. This should be unsurprising given that vaccine-based immunization is an artificial attempt to emulate the mechanisms of natural immunity.

384.     Further, because vaccination cards can and are often faked, immunity gained through prior infection is a much more reliable and verifiable indicator of protection against transmission, infection, and personal protection against COVID-19.

385.     A comparison of 'immunity' between a person with prior COVID-19 infection and a person with vaccine-induced can be demonstrated through serological testing, comparing not only antibodies to the virus, but also t-cell memory and other immunological markers, which show natural immunity demonstrates a broader and more robust immune response than vaccination.

386.     Had Syneos included recognition of natural immunity as an alternative to vaccination, or allowed it as a reasonable accommodation option to its religious and medically impaired employees, the company would have saved significant amounts of time, resources, and money.

387.     On November 29, 2021, the CDC recommended booster doses for individuals 18 years and older 6 months after their initial Pfizer-BioNTech or Moderna series or 2 months after their initial J&J vaccine.

388.     To date, despite CDC guidance, Syneos has not imposed a booster mandate on its employees.

389.     Syneos only selectively "follows the science" from federal health authorities when convenient to further its discriminatory goals. Once it executed the mass termination of religious and medically impaired employees, there was no reason to follow CDC recommendations for boosters because the targeted employees had been eliminated.

70

390.    As of April 2023, Syneos revoked the Mandate and no longer requires proof of COVID-19 vaccination as a condition of employment, despite strong and unequivocal recommendations from federal health authorities for citizens to become vaccinated.

ix.    ***Syneos' Actual and Constructive Knowledge of Severe Risks of Injury Associated with the COVID-19 Vaccines and Reckless Disregard of Plaintiffs' Title VII and ADA Rights***

391.    In justifying the Mandate, Syneos either strongly implied or explicitly stated that the available vaccines were 'safe.'

392.    However, Syneos had actual and/or constructive knowledge that the COVID-19 vaccines could not be guaranteed as safe and in fact were not "safe" by any objective measure.

a.    _EUA fact sheets, VAERS, and V-Safe Document Vaccine Safety Issues_

393.    Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccine readily available after Plaintiffs and those similarly situated submitted religious and medical exemption requests, Syneos required that religious and medically vulnerable employees submit to vaccination as a condition of employment.

394.    Despite clearly stated religious and medical reasons for declining vaccination, Syneos—in reckless disregard of Plaintiffs' Title VII and ADA protected rights—insisted that Plaintiffs abandon their religious beliefs and disregard their medical vulnerabilities and expose themselves to potential vaccine induced harm as a continued condition of employment.

395.    Again, the mandated vaccines do not prevent transmission or infection. At best, the mandated vaccines provided an undefined level of personal protection, a benefit Plaintiffs and those similarly situated gladly declined. However, the mandated vaccines have documented risks,

risks that Syneos required Plaintiffs to expose themselves to as a condition of employment, with full knowledge Plaintiffs were unable to become vaccinated for religious or medical reasons.

396. Emergency Use Authorization ("**EUA**") Fact sheets ("**EUA Fact Sheets**") required for providers of the Pfizer, Moderna, and J&J COVID-19 vaccines, all contain a list of possible adverse reactions, including the possibility of severe allergic reaction.

397. In addition, the EUA Fact Sheets cite myocarditis and pericarditis as potential adverse effects. Notably, these documents explicitly state that a person who has had a reaction to a prior dose of the vaccine or a component of the vaccine should not be administered a second dose.

398. Syneos also had actual and/or constructive knowledge of vaccine adverse events through other sources, specifically through the Vaccine Adverse Event Reporting System ("**VAERS**").

399. VAERS was established in 1990 and is overseen jointly by the CDC and the Food and Drug Administration ("**FDA**").

400. VAERS provides a platform for individuals and healthcare providers to report adverse events to vaccines. The platform collects and aggregates the data of adverse events relating to all vaccines, including the COVID-19 vaccines.

401. As of October 26, 2021, the number of deaths reported to VAERS as a result of the COVID-19 vaccines totaled over 13,422, while the total number of reported deaths from 30 years of VAERS reporting for **all other vaccines** totaled 9,183. Meaning, in less than a full year of administration of the COVID-19 vaccines, there were over 4,000 more deaths reported after a COVID-19 vaccine than that for all vaccines administered over 30 years, combined.

72

402.    When Syneos instituted its Mandate in September of 2021, approximately 623,341 adverse events relating to the COVID-19 vaccine were reported to VAERS. These adverse events included approximately: 13,627 COVID-19 vaccine related deaths, 55,821 COVID-19 vaccine related hospitalizations, 74,368 COVID-19 vaccine related urgent care visits, 17,794 COVID-19 vaccine related cases of permanent disability, and 14,105 other life-threatening COVID-19 vaccine related incidents.

403.    On the date Syneos instituted the Mandate, VAERS data was publicly available and had been reported in the news.

404.    On information and belief, many Syneos employees reported the concerning VAERS data to Syneos' management.

405.    On information and belief, many Syneos employees reported actual and possible adverse events related to the mandated COVID-19 vaccines to Syneos' management.

406.    Despite knowledge of actual and suspected adverse events, Syneos instituted its COVID-19 vaccine requirement on all US-based employees, communicating that the COVID-19 vaccine was "safe."

407.    On the date Syneos executed its mass termination scheme of religious and disabled employees, VAERS data was publicly available and had been reported in the news.

408.    As of December 9, 2021, approximately 927,738 adverse events relating to the COVID-19 vaccine were reported to VAERS. These adverse events included approximately: 19,532 COVID-19 vaccine related deaths, 99,943 COVID-19 vaccine related hospitalizations, 102,602 COVID-19 vaccine related urgent care visits, 31,652 COVID-19 vaccine related cases of permanent disability, and 21,932 other life-threatening COVID-19 vaccine related incidents.

73

409. Despite knowledge of actual and likely vaccine-induced harms, Syneos revoked both religious and disability accommodations for its employees, requiring these individuals receive the COVID-19 vaccine by January 14, 2022, or be terminated on January 31, 2022, and thereby subjecting these employees to an increased risk of physical harm.

410. By January 31, 2022, approximately 1,071,854 adverse events relating to the COVID-19 vaccine were reported to VAERS. These adverse events included approximately: 22,607 COVID-19 vaccine related deaths, 121,597 COVID-19 vaccine related hospitalizations, 115,335 COVID-19 vaccine related urgent care visits, 40,069 COVID-19 vaccine related cases of permanent disability, and 25,777 other life-threatening COVID-19 vaccine related incidents. This data was publicly available and had been reported in the news.

411. Considering the irrationality of requiring a COVID-19 vaccine in January of 2022—after it had been established that the vaccines did not prevent infection and transmission, and considering the documented vaccine-related harms—Syneos enforced the Mandate against religious and medically impaired employees with the intent to harm due to their disfavored religious beliefs, medical impairments, and/or in reckless disregard of employees' rights under Title VII and the ADA. While Syneos certainly had awareness of the dangers associated with the COVID-19 vaccines in the Spring and Summer of 2021 when deciding to universally require vaccination for all employees, the company had an even greater grasp of vaccine associated dangers when it executed its mass termination scheme in late January 2022.

412. A United States Department of Health and Human Services ("**HHS**")-funded study evaluating the VAERS system was performed by Harvard Pilgrim Health Care, Inc. from December 2007, through September 2010, aggregating the medical records of 715,000 patients

74

across the country, 376,452 of which were vaccine recipients. The study found that after comparing the medical records of vaccine recipients with the total number of events reported to VAERS, **less than 1% of the total number** of vaccine-induced adverse events were actually reported to VAERS.

413.    The VAERS underreporting problem is supported by the CDC's own safety data related to the COVID-19 vaccines.

414.    On or around December 13, 2020, the CDC introduced its smartphone-based program for COVID-19 vaccine recipients called "V-safe." The program allows for users to "quickly and easily share with CDC how you, or your dependent, feel after getting a COVID-19 vaccine."

415.    Out of the 10,094,310 million registered users who submitted data to V-safe, **782,913 users (over 7.7%), reported a health event requiring medical attention, emergency room intervention, and/or hospitalization.**

416.    Over 25% of V-safe users had an event requiring them to miss school or work, and/or prevented normal activities.

417.    Syneos' own business records will reflect that employees who received a COVID-19 vaccine experienced similar rates of adverse events as revealed in the CDC's V-safe data.

418.    Syneos' own business records will reflect that the company had actual and/or constructive knowledge of unacceptable adverse event rates related to the COVID-19 vaccines.

419.    Nonetheless, Syneos pursued enforcement of the Mandate against its religious and medically impaired employees, who were essentially the only remaining unvaccinated employees in its workforce in January of 2022.

75

420. With actual and/or constructive knowledge of unacceptable adverse event rates, and in reckless disregard of religious and medically vulnerable employees' rights under Title VII and ADA, Syneos demanded that they sacrifice their religious convictions, their medical needs, and careers, or submit to increased risk of serious bodily injury.

b. *Known injury of Syneos employee from the COVID-19 vaccine*

421. On or around September 14, 2021, Plaintiff Sellers suffered a severe adverse reaction after receiving the first does of the Pfizer-BioNTech vaccine and immediately notified Syneos of the adverse reaction.

422. On information and belief, Syneos knew of similar reports of adverse reactions to the COVID-19 vaccines, both through reports of injury from other employees and/or concerns raised by employees, regarding the risks attributable to the COVID-19 vaccines.

423. As of September 2, 2021, there had been approximately 25,921 COVID-19 vaccine related allergic reactions reported to VAERS.

424. Despite access to this information, Syneos instituted its COVID-19 vaccine requirement on all US-based employees, communicating that the COVID-19 vaccine was "safe."

425. Despite knowledge of Plaintiff Seller's adverse reaction, Syneos continued enforcement of the Mandate against employees it had already acknowledged possessed medical impairments entitling them to accommodation under the ADA.

426. As of December 9, 2021, there had been approximately 34,481 cases of severe allergic reaction relating to the COVID-19 vaccine reported to VAERS.

427. Despite access to this information, Syneos revoked disability-based accommodations for those with medical exemptions for allergic reactions to prior doses of the

COVID-19 vaccine, and/or prior severe allergic reactions to components in the COVID-19 vaccines.

428. As of January 31, 2022, there had been approximately 38,603 cases of severe allergic reaction relating to the COVID-19 vaccines reported to VAERS.

429. Despite access to this information, Syneos terminated employees with documented severe allergic reactions to prior doses of the COVID-19 vaccine and/or components in the COVID-19 vaccines—for non-compliance with the Mandate.

c. *Documented risks to pregnant and nursing mothers*

430. On September 2, 2021, Syneos' disseminated its Policy Document to employees, instructing "[p]regnant or nursing mothers who are concerned about receiving their vaccinations during their pregnancy or during the time they are nursing should speak to their physician about their circumstances, and may, if appropriate, seek a medical accommodation."

431. As of September 2, 2021, there had been approximately 1,671 COVID-19 vaccine-related miscarriages reported to the VAERS system.

432. Despite access to this information, Syneos instituted its COVID-19 vaccine requirement on all US-based employees, including expecting or soon-to-be-expecting mothers, indicating that the COVID-19 vaccine was "safe" for expecting mothers.

433. As of December 9, 2021, approximately 3,148 COVID-19 vaccine-related miscarriages were reported to the VAERS system.

434. Despite access to this information, Syneos revoked disability accommodations for those with medical exemptions relating to pregnancy and nursing.

77

435. As of January 31, 2022, approximately 3,786 COVID-19 vaccine-related miscarriages were reported to the VAERS system.

436. Despite access to this information, Syneos terminated pregnant and nursing mothers who abstained from receiving a COVID-19 vaccine due to pregnancy.

437. Since the COVID-19 vaccines were introduced in December 2020, birth rates have dropped precipitously in developed countries with relatively higher COVID-19 vaccination rates.

438. Countries with relatively lower COVID-19 vaccination rates have not seen similar birth rate declines.

439. At the time Syneos executed its mass termination scheme, there were publicly available reports, studies, information, and testimonials from licensed physicians and credentialed researchers, detailing known incidences and likelihood of harm to the female reproductive system from COVID-19 vaccines.

440. Plaintiff Dailey specifically raised concerns to Syneos regarding the risk of harm to her unborn child after Syneos refused to accommodate her pregnancy and permit her to continue working while unvaccinated and pregnant.

441. On information and belief, other pregnant or nursing Syneos' employees raised concerns regarding the risks associated with the COVID-19 vaccine for pregnant and nursing mothers.

442. Documents from Pfizer derived from its COVID-19 testing before emergency authorization was approved, titled "Cumulative Analysis of Post-authorization Adverse Event Reports," reveal that 274 pregnant women participated in the clinical trials reported to have

78

received the Pfizer COVID-19 vaccine. Pfizer **did not fully report the outcomes** of these pregnancies.

443.    For the 32 pregnancies that were actually reported, 25 resulted in miscarriage—**a 78% miscarriage rate**.[7]

444.    Syneos knew or should have known the risks attributable to the COVID-19 vaccines relative to womens' reproductive health and pregnancy.

445.    Syneos' refusal to accommodate pregnant and nursing mothers—despite actual and/or constructive knowledge of vaccine-related risks to the mothers, children, and unborn children—was done with reckless disregard of Plaintiffs' and those similarly situated rights under the ADA.

> d.    *Myocarditis, pericarditis, and other cardiovascular events*

446.    As of September 2, 2021, there were approximately 6,071 COVID-19 related heart attacks, and 5,093 COVID-19 related cases of myocarditis/pericarditis reported to VAERS.

447.    Despite access to this information, Syneos instituted its COVID-19 vaccine requirement on all U.S. based employees, communicating that the COVID-19 vaccines were "safe."

448.    As of December 9, 2021, there were approximately 9,756 heart attacks and approximately 15,424 cases of myocarditis/pericarditis relating to the COVID-19 vaccines reported to VAERS.

---

[7] *See* Section 5.3.6 *Cumulative Analysis of Post-authorization Adverse Event Reports*, Pfizer (published Apr. 2022) at p. 12 of 38, *available at*   https://phmpt.org/wp-content/uploads/2022/04/reissue_5.3.6-postmarketing-experience.pdf.

449. Despite access to this information, Syneos revoked disability accommodations for those with medical exemptions relating to prior histories of cardiac-related health conditions precluding them from receiving the COVID-19 vaccine.

450. On January 31, 2022, there were approximately 11,502 heart attacks and 29,716 cases of myocarditis/pericarditis relating to the COVID-19 vaccines reported to VAERS.

451. Despite access to this information, Syneos terminated employees with documented histories of cardiac conditions—placing them at severe risk of injury or death if they received the COVID-19 vaccine—for not receiving the COVID-19 vaccine.

452. The CDC has acknowledged cardiovascular events such as myocarditis and pericarditis as known adverse reactions to the COVID-19 vaccine.

453. Syneos knew Plaintiff Slagle possessed a cardiac condition that placed her at increased risk for severe injury or death if she received a COVID-19 vaccine. Nonetheless, Syneos refused to accommodate Plaintiff Slagle, forcing her to choose between termination or risk of injury or death as a term and condition of her employment

454. Syneos' refusal to accommodate employees with underlying heart conditions— despite actual and/or constructive knowledge of vaccine-related risks for these employees—was done with reckless disregard of Plaintiffs' and those similarly situated rights under the ADA.

e. *Known risk of anaphylaxis and severe allergic reaction*

455. As of September 2, 2021, there had been approximately 5,721 COVID-19 vaccine-related cases of anaphylaxis reported to VAERS.

456. Despite access to this information, Syneos instituted its COVID-19 vaccine requirement on all U.S. based employees, communicating that the COVID-19 vaccine was "safe."

80

457.    As of December 9, 2021, approximately 8,301 cases of anaphylaxis and 34,481 cases of severe allergic reaction relating to the COVID-19 vaccine were reported to VAERS.

458.    Despite access to this information, Syneos revoked disability accommodations for those with medical exemptions relating to prior histories of anaphylaxis and severe allergic reaction to elements in the COVID-19 vaccines.

459.    As of January 31, 2022, approximately 8,952 cases of anaphylaxis and 38,603 cases of severe allergic reaction relating to the COVID-19 vaccines had been reported to VAERS.

460.    Despite access to this information, Syneos terminated those with prior histories of anaphylaxis and severe allergic reaction to elements in the COVID-19 vaccines. These employees were terminated for declining to place their health at risk and receive COVID-19 vaccine.

461.    As of March 30, 2023, approximately 10,443 COVID-19 vaccine related cases of anaphylaxis and approximately 42,309 COVID-19 vaccine related cases of severe allergic reactions have been reported to VAERS.

462.    Syneos' own Policy Document states that [the Mandate] "is based upon guidance provided by the Centers for Disease Control and Prevention (CDC) and public health and licensing authorities, as applicable."

463.    The CDC's guidance specifically advises against COVID-19 vaccination for those with documented history of anaphylaxis or severe allergic reaction to components in the COVID-19 vaccines.

464.    Syneos knew of at least one employee, Plaintiff Husain, with documented allergies and a history of anaphylaxis to components in the COVID-19 vaccines.

465. Syneos refused to accommodate Plaintiff Husain, requiring her to choose between receiving the COVID-19 vaccine (risking severe injury or death) or termination.

466. On information and belief, Syneos denied accommodations to other employees with medical histories of allergic reaction/anaphylaxis to components in the COVID-19 vaccines. Syneos required these employees to choose between receiving the COVID-19 vaccine and risking severe injury or death or termination.

467. In sum, Syneos knew or should have known that the mandated COVID-19 vaccines were not safe by any objective measure as the COVID-19 vaccines had both known and potential risks of serious harm, including death.

468. Syneos also had had actual and/or constructive knowledge that the vaccines it mandated were not preventing infection or transmission, and thus were only providing a potential and undefined level of personal protection against severe illness and death, a benefit medically impaired and religious employees gladly declined.

469. Nonetheless, despite vaccine inefficacy and clear safety signals, Syneos demanded in reckless disregard for Plaintiffs' rights under Title VII and the ADA that they submit to vaccination or face termination.

**F. Syneos Retaliates Against Employees Who Sought Religious and Disability Based Accommodations Through Revoking Low and No-Cost Accommodations, Through Terminating their Employment, and Through Withholding Bonuses and Interfering with Unemployment Claims**

470. Plaintiffs and those similarly situated sought religious and disability-based accommodations in September and October of 2021.

471. Syneos thereafter accommodated hundreds of unvaccinated employees through regular testing.

82

472. Subsequently, Syneos revoked their testing accommodation. Impacted employees both explicitly and implicitly maintained their requests for reasonable accommodations for the period after the revocation through their terminations.

473. In this interim period, many employees, including Plaintiffs Slagle, Spurgeon, Sellers, and Kaminski voiced objections to the mass revocation and pointed out the pretextual and unlawful nature of Syneos' actions.

474. Soon thereafter, Syneos terminated hundreds of its religious and medically impaired employees.

475. Further, several Plaintiffs and many similarly situated unvaccinated employees were due bonus payments for work completed in the Fourth Quarter of 2021.

476. On information and belief, Syneos had a common unwritten practice of paying out bonuses to those employees terminated in mass layoff situations. Syneos treated Plaintiffs and those similarly situated as if their terminations were "at fault" and thus able to have bonuses "lawfully" withheld. However, the only cited "fault" Syneos cited for these employees was that it was terminating their employment because of undue hardship and for maintaining their religious beliefs and for acting within their physician's advice to preserve their health by declining vaccination.

477. Syneos refused to pay Plaintiffs their respective bonuses.

478. Many Plaintiffs were denied or delayed unemployment benefits because Syneos classified their termination as "for cause" in state unemployment administrative forums.

479.    For example, Syneos classified Slagle's termination "for cause" and because of this classification, on February 18, 2022, the South Carolina Department of Employment and Workforce denied Slagle unemployment benefits.

480.    On March 15, 2022, Hearing Officer Roman Dodd reversed the February 18, 2022, finding that Syneos terminated Slagle without cause.

481.    Hearing Officer Dodd classified Syneos' revocation of Slagle's religious accommodation request as being "without a reasonable explanation."

## CLASS ALLEGATIONS

482.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of all other persons similarly situated.

483.    There are three distinct classes—the Religious Class, the Disability Class, and the Regarded as Disability Class. Each Class also contains a subclass of individuals who, at the time of their termination, had natural immunity from prior infection with COVID-19 (the "**Natural Immunity Subclasses**"). The Classes, and their respective subclass, are described in full below.

### A. Religious Class

484.    Syneos subjected Plaintiffs Tina Morris, Janet O'Callaghan, Melissa Slagle, Mary Dailey, Barbara Kaminski, Andrew Smith, Tanya Spurgeon, Jennifer Cipollino, and Jill Roberts (the "**Religious Plaintiffs**"), and those similarly situated (the "**Religious Class**"), to a uniform pattern and practice of religious discrimination. Demonstrating the extent of Syneos' motivations to rid itself of religious employees, Syneos terminated virtually all employees who possessed sincere religious beliefs against vaccination, including those who, like Plaintiffs Morris, O'Callaghan, Slagle, Dailey, Kaminski, Smith, Spurgeon, Cipollino, and Roberts possessed

84

natural immunity against COVID-19 through prior infection and recovery (the "**Religious Natural Immunity Subclass**"). Plaintiffs, on behalf of themselves and those similarly situated, propose the following definitions, subject to amendment as appropriate, for the Religious Class and the Natural Immunity Subclass:

<u>Main Religious Class:</u>

All former Syneos' employees who: (1) sought religious exemption and accommodation from the Mandate; (2) received affirmation from Syneos that they possessed sincere religious beliefs entitling them to a possible religious accommodation; (3) were temporarily accommodated; and (4) were subjected to adverse employment action.

<u>Religious – Natural Immunity Subclass</u>

All former Syneos employees who fall within the Religious Class definition, but who also: (1) had natural immunity from prior COVID-19 infection at the time of the adverse action on their employment; and (2) could have and/or would have shown proof of their natural immunity had Syneos allowed proof of natural immunity as a reasonable accommodation option or as fulfilling the Mandate's immunization requirement.

485.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class and Subclass before the Court determines whether certification is appropriate.

486.    The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a), (b)(2), and (b)(3).

487.    <u>Numerosity</u>. The class members are so numerous that joinder of all members is impracticable.  Though the exact number of class members is unknown at this time, based on information and belief, the Religious Class consists of more than 100 former employees of Syneos

who sought religious accommodation to the Mandate, had their sincere religious beliefs affirmed by Syneos, were granted a religious accommodation, and suffered adverse employment action because of purported non-compliance with the Mandate. The identities of the class members are ascertainable through Syneos' records, class members' records, publication notice, self-identification, or other means.

488. <u>Commonality</u>. There are questions of law and fact common to the Religious Class which predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

a) Whether Syneos engaged in the conduct alleged herein;

b) Whether requiring Religious Class Members to comply with the Mandate violated Title VII and evidenced disparate treatment discrimination, regardless of whether the company could provide reasonabale accommodations without undue hardship, because Syneos knew or should have known that the mandated COVID-19 vaccines were incapable of preventing transmission or infection, and knew or should have known that vaccinated employees were contracting and spreading COVID-19 at very high rates during the relevant timeframes;

c) Whether Syneos pretextually denied religious accommodations to the Religious Class when it could have accommodated through any of the many low cost and no-cost accommodation options;

d) Whether Syneos knew at the time of the Revocation Letter that the overwhelming majority of its clients and prospective clients were neither requiring proof of COVID-19 vaccination, nor requiring proof of a negative COVID-19 test;

86

e) Whether Syneos knew, or should have known, that recognition of natural immunity was a suitable and equally, if not more effective, alternative to COVID-19 vaccination that would not have entailed any cost to Syneos;

f) Whether Syneos knew at the time it terminated Religious Plaintiffs that free testing options were publicly available, despite months later claiming in its EEOC Position Statements that the cost of testing would result in undue hardship;

g) Whether Syneos pretextually refused to accommodate religious employees because, based on discriminatory animus, it wanted to rid itself of as many religious employees as possible;

h) Whether Syneos knew in advance of the Mandate and in advance of revoking temporary religious accommodations, and knew well in advance of terminating members of the Religious Class, its actions would negatively impact its religious employees to a statistically significant degree;

i) Whether Syneos proceeded with reckless disregard for the Title VII rights of its religious employees with recognized religious objections to the Mandate;

j) Whether Syneos pre-determined that it would terminate most, if not all, of its employees who possessed religious objections to receiving a COVID-19 vaccine, regardless of its actual ability to provide reasonable accommodations to such employees without undue hardship;

k) Whether Syneos knew or should have known at the time it took adverse employment action against members of the Religious Class and/or the Religious Natural Immunity Subclass that its vaccinated employees were contracting and

spreading COVID-19 at the same, similar, or higher rates than its unvaccinated employees;

l) Whether, before revoking the temporary accommodations provided, Syneos performed an individualized assessment of each member of the Religious Class's accommodation request to actually determine its ability to accommodate without undue hardship;

m) Whether, after revoking the temporary accommodations provided, Syneos thereafter performed an individualized assessment of each member of the Religious Class's accommodation request to monitor and re-evaluate its ability to accommodate without undue hardship as critical facts emerged regarding vaccine inefficacy and natural immunity;

n) Whether Syneos had financial incentives (or penalties) tied to contracts with the federal government that pretextually influenced the shaping, implementation, and ultimate results of the COVID-19 accommodations process, rather than a good-faith individualized assessment of whether it could accommodate without undue hardship;

o) Whether Syneos deviated from its universal denial of accommodation for a select few employees—exempting them from the Mandate based on their relationship with Syneos' upper management—without regard for whether they actually possessed sincere religious beliefs entitling them to accommodation under Title VII;

88

p) Whether Syneos decision to allow its unvaccinated Florida-based employees to continue working after it terminated the Religious Class Members demonstrates the company was able to accommodate employees without undue hardship;

q) Whether Syneos decision to terminate unvaccinated religious employees who were teleworking when terminated demonstrates evidence of discriminatory intent;

r) Whether Syneos permitting unvaccinated employees to continue working in job roles with significant in-person contact demonstrates pretext with regard to Syneos' assertion of undue hardship;

s) Whether Syneos exempted unvaccinated Florida employees from the Mandate without regular testing or heightened safety protocols;

t) Whether Syneos was motivated to physically harm members of the Religious Class due to: (1) its knowledge of adverse events to COVID-19 vaccination observed after the Mandate was instituted; and (2) considering it also knew the COVID-19 vaccines did not prevent transmission or infection;

u) Whether Syneos knew, prior to granting the temporary period of accommodation, that it had no intention to permanently accommodate, and only temporarily accommodated members of the Religious for strategic legal purposes;

v) Whether Syneos' uniform communication strategy to not respond or to vaguely respond to questions from members of the Religious Class about accommodation options and objections to the accommodations process evidences bad faith;

w) Whether Syneos implemented security protocols to ensure that all employees claiming to be vaccinated for COVID-19 in fact received the injections and did not submit fake vaccination cards;

x) Whether Syneos conducted antibody testing of all vaccinated employees to confirm that all who received the COVID-19 vaccine actually elicited an immune response;

y) Whether Syneos retaliated against the Religious Class by classifying their terminations as "for cause" or "misconduct" so as to preclude their ability to receive unemployment benefits;

z) Whether Syneos made a corporate decision to retaliate against the Religious Class after they submitted religious exemption request and requests for accommodation;

aa) Whether Syneos intentionally amended its bonus payout policy in anticipation of terminating the Religious Class, so it could avoid paying out bonuses in bad faith; and

bb) Whether Syneos intentionally ceased its contact tracing protocols after January 31, 2022, so as to obfuscate the numbers of those vaccinated employees continuing to contract COVID-19.

489. <u>Typicality</u>. Religious Plaintiffs' claims are typical of those of other putative class members because they each sought religious accommodation to the Mandate, were told by Syneos that their stated religious beliefs were sincere and religious in nature, were accommodated by Syneos, subsequently had their accommodation revoked, and then suffered adverse employment action.

90

490.    Adequacy of Representation. Religious Plaintiffs will fairly and adequately represent and protect the interests of the Religious Class members. Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

491.    Predominance.  Syneos has engaged in a common course of conduct towards Religious Plaintiffs and the Religious Class, in that they all were subjected to the same overarching Mandate, had the religious sincerity of their objections to the Mandate affirmed by Syneos, were granted a temporary religious accommodation, uniformly had their accommodations revoked, and then were terminated for purported non-complinace with the Mandate. The common questions of fact and law arising from Syneos' conduct affecting the Class members outlined in this Complaint predominate over any individual issues and can be resolved through common answers to those questions.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

492.    Superiority.  A Class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation across multiple jurisdictions.  Moreover, absent class certification, most Religious Class members would find that the cost of litigating their individual claims against a global biopharmaceutical corporation to be prohibitively high and would therefore be without remedy.  The prosecution of single actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Syneos. In contrast, the conduct of this action as a class action presents far fewer management difficulties,

91

conserves judicial resources, and the parties' resources, and protects the rights of each Class member.

493.    Finally, all members of the proposed Religious Class are readily ascertainable. Syneos has access to all putative Class members' names, contact information, and employment records sufficient to provide notice to those affected by the class action.

**B. Disability Class**

494.    Syneos also subjected Plaintiffs Slagle, Sellers, Husain, and Dailey (the "**Disability Plaintiffs**") and those similarly situated (the "**Disability Class**") to a pattern and practice of disability-based discrimination. Demonstrating the extent of Syneos' motivations to rid itself of disabled employees, Syneos terminated virtually all employees who possessed qualifying disabilities precluding vaccination, including those who, like Plaintiffs Slagle, Sellers, Husain and Dailey possessed natural immunity against COVID-19 through prior infection and recovery (the "**Disability Natural Immunity Subclass**"). Plaintiffs, on behalf of themselves and those similarly situated, propose the following definition, subject to amendment as appropriate, for the Disability Class and the Natural Immunity Subclass:

> Main Disability Class:
> All former Syneos employees who: (1) sought medical exemption and accommodation from the Mandate; (2) received affirmation that their medical impairment qualified for accommodation and/or were told they qualified for a medical exemption; (3) were thereafter accommodated; and (4) suffered adverse employment action.

> Natural Immunity Subclass
> All former Syneos employees who fall within the Disability Class definition, but who also: (1) had natural immunity from prior COVID-19 infection at the time of the adverse action on their employment;

92

> and (2) could have and/or would have shown proof of their natural immunity had Syneos allowed proof of natural immunity as a reasonable accommodation option or as fulfilling the Mandate's immunization requirement.

495. Plaintiffs reserve the right to modify or amend the definition of the proposed class and subclass before the Court determines whether certification is appropriate.

496. The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a), (b)(2), and (b)(3).

497. <u>Numerosity</u>. The members of the Disability Class are so numerous that joinder of all members is impracticable. Though the exact number of class members is unknown at this time, based on information and belief, the class consists of approximately 100 former Syneos employees who sought a medical exemption and disability-based accommodation to the Mandate, had their qualifying medical impairment affirmed by Syneos, were granted accommodation, and suffered adverse employment action. The identities of the members of the Disability Class are ascertainable through Syneos' records, class members' records, publication notice, self-identification, and other means.

498. <u>Commonality</u>. There are questions of law and fact common to the Disability Class, and Disability Natural Immunity Subclass, which predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

a) Whether Syneos engaged in the conduct alleged herein;

b) Whether requiring Disability Class Members to comply with the Mandate evidences discriminatory intent to rid itself of disabled employees in light of the

93

fact Syneos knew or should have known that the available COVID-19 vaccines were not preventing transmission or infection;

c)  Whether Syneos pretextually denied disability accommodations to the Disability Class when it could have accommodated without undue hardship;

d)  Whether Syneos knew at the time of the Revocation Letter that the overwhelming majority of clients and prospective clients were neither requiring proof of COVID-19 vaccination, nor requiring proof of a negative COVID-19 test;

e)  Whether Syneos knew its actions would negatively impact its disabled employees to a statistically significant degree, and nevertheless proceeded with reckless disregard for the ADA rights of disabled employees;

f)  Whether Syneos knew, prior to granting the temporary period of accommodation, that it had no intention to permanently accommodate, and only temporarily accommodated its disabled employees for strategic purposes;

g)  Whether Syneos knew, or should have known, that recognition of natural immunity was a suitable alternative to COVID-19 vaccination and would have accommodated the Natural Immunity Subclass without any cost to Syneos;

h)  Whether Syneos pretextually exploited the Mandate to terminate disabled employees that would otherwise require severances and/or bonus payouts in a traditional reduction in force;

i)  Whether Syneos knew or should have known at the time it acted adversely against members of the Disability Class and/or the Disability Natural Immunity Subclass

94

that its vaccinated employees were contracting and spreading COVID-19 at the same, similar, or higher rates than its unvaccinated employees;

j) Whether Syneos was motivated to physically harm and/or acted with reckless indifference towards members of the Disability Class due to: (1) its knowledge of adverse events to COVID-19 vaccination observed after the Mandate was instituted; (2) with knowledge that such adverse events placed members of the Disability Class at a heightened risks of serious bodily injury or death because of their documented medical impairments; and (3) considering it also knew the COVID-19 vaccines did not prevent transmission or infection;

k) Whether Syneos had financial incentives (or penalties) tied to contracts with the federal government that pretextually influenced the shaping, implementation, and ultimate results of the COVID-19 accommodations process, rather than a good-faith individualized assessment;

l) Whether Syneos pre-determined that it would terminate most, if not all, employees with medical impairments rendering them unable to receive a COVID-19 vaccine, regardless of its actual ability to provide reasonable accommodations to such employees without undue hardship;

m) Whether Syneos' decision to allow its unvaccinated Florida-based employees to continue working after it terminated the Disability Class Members demonstrates the company was able to accommodate employees without undue hardship;

95

n) Whether Syneos performed an individualized assessment of each member of the Disability Class's accommodation calculated towards actually finding a possible accommodation that would not cause undue hardship;

o) Whether Syneos deviated from its universal denial of accommodation for a select few employees, exempting them from the Mandate based on their proximity or importance to Syneos leadership, despite not having disability-based conflicts with the COVID-19 vaccine;

p) Whether Syneos permitting unvaccinated employees to continue working in job roles with significant in-person contact demonstrates pretext;

q) Whether Syneos continued to accommodate its Florida employees from the Mandate without any testing or additional safety restrictions;

r) Whether Syneos exempted Florida employees from the Mandate without regular testing or heightened safety protocols;

s) Whether Syneos knew at the time it terminated Disability Plaintiffs that free testing options were publicly available, despite months later claiming in its EEOC Position Statements that the cost of testing would result in undue hardship;

t) Whether Syneos can credibly assert a direct threat defense against members of the Disability Class and/or the Natural Immunity Subclass, but not simultaneously perceive its vaccinated employees (who were contracting COVID-19 more frequently than the unvaccinated) as a direct threat.

u) Whether Syneos failure to engage in an ongoing interactive process with Disability Class Members violated the ADA and/or evidences bad faith intention to violate the ADA;

v) Whether Syneos' uniform communication strategy to not respond or to vaguely respond to questions from members of the Disability Class about accommodation options and objections to the accommodations process evidences bad faith;

w) Whether there were no available accommodations for the Disability Class that would not result in significant difficulty or expense to Syneos;

x) Whether Syneos implemented security protocols to ensure that all employees claiming to be vaccinated for COVID-19 in fact, received the injections and did not submit fake vaccination cards;

y) Whether Syneos conducted antibody testing of all vaccinated employees to confirm that all who received the COVID-19 vaccine actually elicited an immune response;

z) Whether Syneos retaliated against the Disability Class by classifying their terminations as "for cause" or "misconduct" so as to preclude their ability to receive unemployment benefits;

aa) Whether Syneos intentionally amended its bonus payout policy in anticipation of terminating the Religious Class, so it could avoid paying out bonuses in bad faith; and

bb) Whether Syneos intentionally ceased its contact tracing protocols after January 31, 2022, so as to obfuscate the numbers of those vaccinated employees continuing to contract COVID-19.

97

499.   <u>Typicality.</u> Disability Plaintiffs' claims are typical of those of other members of the Disability Class because they sought medical exemption and accommodation from the Mandate; received affirmation that their medical impairment qualified for accommodation and/or were told they qualified for a medical exemption; were thereafter accommodated; subsequently had their accommodation revoked; and suffered adverse employment action.

500.   <u>Adequacy of Representation</u>. The Disability Plaintiffs will fairly and adequately represent and protect the interests of the members of the Disability Class.  Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

501.   <u>Predominance</u>. Syneos has engaged in a common course of conduct toward Plaintiffs and members of the Disability Class, in that they all were subject to the same overarching Mandate, affirmation of their qualifying disability, grant of accommodation, revocation of accommodation, and were subjected to adverse employment action.  The common questions of fact and law arising from Syneos' conduct affecting Class Members outlined in this Complaint predominate over any individual issues and can be resolved through common answers to those questions.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

502.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation across several jurisdictions.  Moreover, absent class certification, most members of the Disability Class would find that the cost of litigating their individual claims against an international pharmaceutical

98

corporation to be prohibitively high and would therefore be without remedy. The prosecution of individual actions by members of the Disability Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Syneos. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class member.

503.     Finally, all members of the proposed Disability Class are readily ascertainable. Syneos has access to members of the Disability Class's names, contact information, and employment records sufficient to provide notice to those affected by the class action.

**C.  "Regarded As" Disabilty Class**

504.     Syneos also subjected Regarded As Disability Plaintiffs, a group that potentially includes Plaintiffs Slagle, Sellers, Husain, and Dailey ("**R/A Plaintiffs**") to a pattern and practice of disability-based discrimination (the "**Regarded as Disability Class**") by treating them as though they had an ADA-qualifying disability and then terminating their employment because of their perceived disabilities.  Demonstrating the extent of Syneos' motivations to rid itself of employees it perceived as disabled, Syneos terminated virtually all employees who it potentially regarded as disabled, including those who, like Plaintiffs Slagle, Sellers, Husain and Dailey possessed natural immunity against COVID-19 through prior infection and recovery (the **"Regarded As Disability Natural Immunity Subclass"**).

505.     R/A Plaintiffs, on behalf of themselves and those similarly situated, propose the following definition, subject to amendment as appropriate, for the Regarded As Disability Class:

> Main Regarded As Disability Class:
> All former Syneos employees who: (1) sought medical exemption and accommodation from the Mandate; (2) received affirmation that their medical

99

impairment qualified for accommodation; (3) were thereafter accommodated and/or were told they qualified for a medical exemption; (4) do not meet the definition of being actually "disabled" under the ADA; and (5) suffered adverse employment action.

Natural Immunity Subclass
All former Syneos employees who fall within the Regarded As Disability Class definition, but who also: (1) had natural immunity from prior COVID-19 infection at the time of the adverse action on their employment; and (2) could have and/or would have shown proof of their natural immunity had Syneos allowed proof of natural immunity as a reasonable accommodation option or as fulfilling the Mandate's immunization requirement.

506. Plaintiffs reserve the right to modify or amend the definition of the proposed class and subclass before the Court determines whether certification is appropriate.

507. The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a), (b)(2), and (b)(3).

508. Numerosity. The members of the Regarded As Disability Class are so numerous that joinder of all members is impracticable. Though the exact number of class members is unknown at this time, based on information and belief, the class consists of up to 100 former Syneos employees who sought disability accommodation to the Mandate, had their medical impairment affirmed as qualifying for a medical exemption and accommodation, were granted an accommodation and treated as though they had a qualifying disability, and suffered adverse employment action. The identities of the members of the Regarded As Disability Class are ascertainable through Syneos' records, class members' records, publication notice, self-identification, and other means.

100

509. <u>Commonality</u>. There are questions of law and fact common to the Regarded As Disability Class and the Regarded As Natural Immunity Subclass, which predominate over any questions affecting only individual class members.  The common questions of law and fact include, without limitation:

a) Whether Syneos engaged in the conduct alleged herein;

b) Whether the common questions of law and fact outlined in the Disability Class section directly above apply equally to the Regarded As Disability Class and the Regarded As Natural Immunity Subclass;

c) Whether requiring Regarded As Disability Class Members to comply with the Mandate evidences discriminatory intent to rid itself of disabled employees and employees Syneos regarded as disabled, at a time it knew or should have known that the available COVID-19 vaccines were not preventing transmission or infection.

510. <u>Typicality.</u> R/A Disability Plaintiffs' claims are typical of those of other members of the Regarded As Disability Class because they sought medical exemption and accommodation from the Mandate; received affirmation that their medical impairment qualified for accommodation and/or were told they qualified for a medical exemption; were thereafter treated as though they were disabled and accommodated; subsequently had their accommodation revoked; and suffered adverse employment action.

511. <u>Adequacy of Representation</u>. The R/A Disability Plaintiffs will fairly and adequately represent and protect the interests of the members of the Regarded As Disability Class.

Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

512.    Predominance. Syneos has engaged in a common course of conduct toward Plaintiffs and members of the Regarded As Disability Class, in that they all were subject to the same overarching Mandate, Syneos affirmed that they possessed a qualifying disability and treated them as though they were disabled, grant of accommodation, revocation of accommodation, and adverse employment action.  The common questions of fact and law arising from Syneos' conduct affecting Regarded As Disabled Class Members outlined in this Complaint predominate over any individual issues, and can be resolved through common answers to those questions.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

513.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation across several jurisdictions.  Moreover, absent class certification, most members of the Regarded As Disability Class would find that the cost of litigating their individual claims against an international pharmaceutical corporation to be prohibitively high and would therefore be without remedy.  The prosecution of individual actions by members of the Regarded As Disability Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Syneos. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class member.

514.    Finally, all members of the proposed Regarded As Disability Class are readily ascertainable. Syneos will have access to members of the Regarded As Disability Class's names, contact information, and employment records sufficient to provide notice to those affected by the class action.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of Title VII, 42 U.S.C. §2000e, *et. seq.***
**Religious Discrimination—Failure to Accommodate and/or Disparate Treatment Religious Discrimination**
**(On behalf of Religious Plaintiffs and the Religious Class Members)**

515.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

516.    This claim is brought by the Religious Plaintiffs for themselves and on behalf of the Religious Class. Plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to Syneos' widespread pattern and practice of religious discrimination and multiple of these plaintiffs have received a Notice of Right to Sue from the EEOC.

517.    Syneos engaged in a comprehensive pattern and practice of religious discrimination: (1) through refusing to accommodate hundreds of its religious employees when many no-cost and low-cost accommodation options were available; and (2) through direct and "indirect evidence whose cumulative probative force supports a reasonable inference that [the mass termination] was discriminatory." *Lawrence v. Mars, Inc*., 955 F.2d 902, 905-06 (4th Cir. 1992). Here, because Syneos knew the strong majority of COVID-19 cases recorded within its workforce from July of 2021 through January of 2022—as well as an unacceptable relative

103

proportion of positive cases—were attributable to its vaccinated employees, not unvaccinated religious employees, the circumstances surrounding the Mandate's implementation and the mass termination gives rise to strong inferences of Syneos' unlawful motives to rid itself of religious employees.

518. Syneos took adverse employment action against Religious Plaintiffs "because of" their religious beliefs.

519. Title VII imparts "favored treatment" to religious employees. *EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 785 (2015). A company is free to institute facially neutral policies (such as a vaccination mandate) as an ordinary matter. "But when an [employee] requires an accommodation as an aspec[t] of religious . . . practice, it is no response that the subsequent [adverse employment action] was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation," *Id.* at 775 (Internal quotations and citations omitted).

520. Religious Plaintiffs can also show a comprehensive scheme of religious discrimination because of Syneos' refusal to accommodate their religious objections, even though many low cost and no-cost accommodation options were available.

521. To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017).

522.     Religious Plaintiffs hold sincere religious beliefs in conflict with receiving a COVID-19 vaccine and were therefore precluded from complying with the Mandate.  In fact, these Plaintiffs lost their livelihoods for holding true to their religious beliefs, demonstrating the intensity of their sincere convictions.

523.     Religious Plaintiffs and members of the Religious Class informed Syneos of their sincere religious beliefs through requesting religious accommodations to the Mandate.

524.     Syneos uniformly conceded the sincerity and religious nature of Religious Plaintiffs beliefs: (1) through its issuance of emails explicitly confirming the religious nature and sincerity of Religious Plaintiffs' and Class Members' beliefs; and (2) through granting their religious exemption request and accommodating their religious beliefs through December 9, 2021.

525.     Further, to the extent Syneos attempts to reverse course on its previous concessions regarding religious sincerity, the Fourth Circuit has made clear that it is not within the purview of employers or even the court "to question the correctness or even the plausibility of . . . religious understandings." *Consol Energy*, 860 F.3d at 142. Syneos followed the law when it acknowledged the religious sincerity of Religious Plaintiffs and those similarly situated.

526.     Syneos took adverse employment action against Religious Plaintiffs and members of the Religious Class by uniformly revoking accommodations on December 9, 2021 without rational or lawful justification.  Syneos took additional adverse employment action against these employees when it executed its mass termination scheme in late January of 2022.

527.     Syneos intentionally granted the period of accommodation to strategically posture itself against future legal liability and to manufacture illusory hardship through the 'cost' of testing.

528.     Syneos could have accommodated the Religious Plaintiffs without undue burden through many low cost and no-cost options, including but not limited to: (1) recognition of natural immunity, (2) temporary telework, (3) regular COVID-19 testing requirements (which is a more accurate and reliable indicator of COVID-19 infection than vaccination), (4) enhanced safety protocols, or (5) through any combination of the above options.

529.     Religious Plaintiffs and the Religious Class Members were able to perform the core functions of their jobs throughout the pandemic while unvaccinated and without testing requirements.  They were highly productive and qualified employees who were increasing Syneos' profits throughout the pandemic. They were able to continue to do so without being vaccinated, or with reasonable accommodation.

530.     Despite claims by Syneos that testing costs were unsustainable and an undue burden due to cost, tests were available for free and would have been no additional expense to Syneos. Moreover, Religious Plaintiffs were all willing to pay costs associated with accommodating their religious beliefs through regular testing, and, as described above, there were other reasonable accommodation options available that would not have caused undue hardship.

531.     Any claim of purported administrative burdens associated with tracking testing results is likewise pretextual. Because vaccinated employees were responsible for most all COVID-19 positive cases during the relevant timeframes, any claimed administrative costs related to testing and tracking positive cases were disproportionately associated with vaccinated employees, not the Religious Plaintiffs.

532.     Religious Plaintiffs are also able to establish a case for religious discrimination on alternative grounds under a traditional disparate treatment religious discrimination theory.

106

533.     A plaintiff can prove a claim of religious discrimination under a disparate treatment theory through demonstrating the "employer treated her differently than other employees because of her religious beliefs." *Chalmers v. Tulon Co*., 101 F.3d 1012, 1017 (4th Cir. 1996). Plaintiffs can do this through establishing their "job performance [were] satisfactory and providing direct or indirect evidence whose cumulative probative force supports a reasonable inference that [the] discharge was discriminatory." *Id.* (internal quotations and citations omitted).

534.     Religious Plaintiffs and those similarly situated were members of a protected classification, which Syneos acknowledged, were qualified for their jobs and, other than non-compliance with the Mandate, and were performing their job duties very well.

535.     Syneos knew on the date it instituted the Mandate that the required vaccines did not prevent transmission or infection, as publicly stated by prominent public health officials.

536.     Thus, the Mandate was instituted not for workplace safety, but as a convenient tool to purge religious and medically impaired employees, in violation of Title VII and the ADA.

537.     Syneos also knew or should have known before it instituted the Mandate that most if not all of the remaining unvaccinated employees in its workforce had refrained from becoming vaccinated due to religious reasons or due to medical impairments. Syneos also knew at this time that the strong majority of COVID-19 cases recorded within its workforce were attributable to its vaccinated employees, not unvaccinated religious employees.

538.     Syneos had also learned through adverse events reported within its workforce and through emerging publicly available reports that the COVID-19 vaccines carried unacceptable rates of adverse events. Regardless, even if Syneos had not known of the high percentages of religious employees that would be terminated because of its policies when it instituted the

107

Mandate, and did not fully know the extent of vaccine inefficacy and vaccine related harms at that time, the company was certainly more fully aware of all of the above when it revoked accommodations for the Religious Class and those similarly situated. And the company had an even greater awareness of all of the above in January of 2022 when it terminated many hundreds of its religious employees.

539. Syneos also knew that similarly situated employees without religious objections to the Mandate would not be impacted by the mass termination, despite the fact that they posed an equal if not greater safety risk to the workforce than members of the Religious Class.

540. Accordingly, the circumstances surrounding the Mandate's institution, the accommodation revocation, and the mass termination give rise to strong inferences of religious discrimination.

541. Considering the foregoing, Religious Plaintiffs and members of the Religious Class were terminated "because of" their disfavored religious beliefs.

542. Syneos engaged in an intentional, company-wide, and systematic policy, pattern, and practice of religious discrimination against the Religious Class, originating from its Morrisville, North Carolina headquarters. Without lawful justification, Syneos pretextually determined, as a corporate policy, it could not accommodate members of the Religious Class, and decided to purge as many religious employees as it possibly could while using the Mandate as its chosen vehicle to accomplish its unlawful policies.

543. Because Syneos cannot provide legitimate justification for its actions, the foregoing conduct constitutes illegal, intentional discrimination prohibited under 42 U.S.C. § 2000e-2 *et seq*.

544. Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Religious Plaintiffs and the Religious Class members under Title VII. As a direct and proximate consequence of Syneos' discriminatory conduct, Religious Plaintiffs and the Religious Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

545. In addition, as a direct and proximate consequence of Syneos' actions, the Religious Plaintiffs have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

546. Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT II

**Violation of Title VII, 42 U.S.C. §2000e,** *et. seq*.
**Religious Discrimination—Failure to Accommodate and/or Disparate Treatment Religious**
**(On behalf of the Religious Natural Immunity Subclass)**

547. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

548. This claim is brought by Plaintiffs O'Callaghan, Slagle, Morris, Dailey, Kaminski, Smith, Spurgeon, Roberts, Cipollino (collectively, "**Religious N.I. Plaintiffs**") for themselves and on behalf of the Religious Natural Immunity Subclass.

549. The Religious N.I. Plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to Syneos' pattern and practice of religious discrimination and multiple of these Plaintiffs have received a Notice of Right to Sue from the EEOC.

109

550.     Religious N.I. Plaintiffs possess sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.  In fact, these Plaintiffs lost their livelihoods for holding true to their religious beliefs, demonstrating the intensity and sincerity of their convictions.

551.     Religious N.I. Plaintiffs and members of the Subclass informed Syneos of their sincere religious beliefs through requesting religious accommodations to the Mandate.

552.     Syneos conceded the sincerity and religious nature of Religious N.I. Plaintiffs beliefs through: (1) its issuance of form emails confirming the religious nature and sincerity of Plaintiffs' and Class Members' beliefs; (2) by granting their religious exemption request and accommodating them through December 9, 2021.

553.     For the same reasons Syneos discriminated against the Religious Class under a failure to accommodate and a traditional disparate treatment theory, Syneos also discriminated against members of the Religious N.I. Class. Accordingly, the Count I allegations are incorporated herein by reference.

554.     However, because the N.I. Plaintiffs were able and/or were willing to show proof of their natural immunity on the date they were terminated (and many did provide or offered to show proof of their natural immunity), Syneos' discriminatory actions towards naturally immune religious employees were even more egregious.

555.     Syneos made clear to employees that it would not recognize natural immunity as satisfying the company's immunization requirements and that it would not recognize natural immunity as a possible reasonable accommodation. Had Syneos announced it would recognize natural immunity, every religious employee who had been immunized through prior COVID-19 infection would have submitted proof of natural immunity to save their jobs.

110

556. Many naturally immune religious employees did not obtain proof of their natural immunity because Syneos had made clear it would not recognize it as satisfying the Mandate's requirements.

557. Religious N.I. Plaintiffs and the Natural Immunity Subclass Members had been immunized naturally through prior infection before they were terminated, and Syneos had actual and/or constructive knowledge of their natural immunity when it terminated their employment.

558. If Syneos would have announced, as it should have, immunization through prior infection as satisfying the Mandate or as a qualifying reasonable accommodation option, members of the N.I. Religious Class would have shown proof of their natural immunity in order to preserve their jobs.

559. Due to their natural immunity, these Plaintiffs possessed at least equivalent and likely greater protection against COVID-19 than their vaccinated colleagues, a fact that Syneos was aware of through its business records and through publicly available medical literature when it terminated their employment.

560. Syneos' systematic, company-wide refusal to recognize natural immunity, which has been established through hundreds of years of scientific research and will be affirmed by Syneos' own business records and proof to be shown at trial, forced members of the N.I. Religious Subclass, without lawful justification, to choose between their religious beliefs and their careers.

561. Because Religious N.I. Plaintiffs had at *least* the same level of immunity to COVID-19 as their vaccinated counterparts, Syneos could have accommodated them through simply exempting them from the Mandate, or through providing a religious exemption and accommodation through allowing the continuation of the status quo. No additional burden or cost

111

would have been placed on Syneos, and Syneos could have effectuated its purported "workplace safety" goal to a greater degree through recognizing N.I. Plaintiffs immunization through prior infection.

562.    Syneos treated similarly situated secular employees who had been immunized through vaccination more favorably than religious employees who had been immunized naturally.

563.    The Fourth Circuit confronted a very similar situation in *United States EEOC v. Consol Energy, Inc*., 860 F.3d 131, 151 (4th Cir. 2017) and upheld extensive damages against an employer who insisted on enforcing an irrational policy against a religious employee where enforcement of the policy would have provided only negligible benefits to the employer. Here, there was no benefit to Syneos' purported workplace safety goal by requiring N.I. Plaintiffs to submit to vaccination.

564.    The *Consol Energy* plaintiff possessed religious objections to using his employer's biometric hand scanner. The employer insisted that he use the scanner, even though there were alternatives available (the employee could manually input his employee identification number). *Id.* at 151. While the scanner arguably provided more efficient and accurate reporting, the jury found that any such benefits were only marginal and awarded extensive damages.

565.    The Fourth Circuit upheld the award, reasoning that allowing the employee to enter his ID number into a keypad "would impose no additional burdens or costs on the company." *Id.* at 143.

112

566. Similarly, it would cost nothing for Syneos to have recognized natural immunity as satisfying its immunization requirement. The negligible[8] and hypothetical benefit of insisting religious employees violate their convictions and become artificially immunized is similar to demanding the marginal efficiency benefit of biometric scanning over manual input of an ID number.

567. Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the Title VII rights of Religious N.I. Plaintiffs and the Natural Immunity Subclass members.

568. As a direct and proximate consequence of Syneos' discriminatory conduct, Religious N.I. Plaintiffs and the Natural Immunity Subclass have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

569. In addition, as a direct and proximate consequence of Syneos' actions, the Religious N.I. Plaintiffs and the Subclass have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

570. Accordingly, Plaintiffs request relief as hereinafter described.

---

[8] In fact, peer reviewed studies demonstrate natural immunity against COVID-19 is more robust and durable than vaccine-based immunity. *See, e.g.,* The Lancet, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis,* (February 16, 2023), *available at* https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(22)02465-5/fulltext

## COUNT III

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*
**Religious Discrimination – Disparate Impact**
**(On behalf of the Religious Plaintiffs and Religious Class Members)**

571.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

572.    Title VII authorizes two causes of action against employers: disparate treatment (intentional discrimination) and disparate impact. *Abercrombie,* 575 U.S. at 771.

573.    Under a disparate impact theory, Religious Plaintiffs must identify a business practice that is "facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by business necessity." *Abdus-Shahid v. Mayor of Balt.,* 674 F. App'x 267, 274 (4th Cir. 2017).

574.    Although proof of discriminatory intent is necessary for a plaintiff to succeed on a disparate treatment claim, disparate impact claims **do not** require evidence of intentional discrimination. *Massenburg v. Innovative Talent Solutions, Inc.*, No. 5:16-CV-957-D, at *6 (E.D.N.C. Feb. 4, 2019) (emphasis added).

575.    The Mandate, while facially neutral, served to eliminate essentially every Syneos employee with religious objections to receiving a COVID-19 vaccine. This obviously generated a statistically significant disparity. Syneos' business records will demonstrate the precise level of unlawful disparity the Mandate had on religious employees when compared to relevant comparator population(s).

576.    When it instituted the Mandate, Syneos knew or should have known that a very large percentage of its unvaccinated workforce had declined vaccination for religious reasons.

114

When it instituted the Mandate, Syneos also knew that the mandated vaccines did not stop transmission or infection.

577. Therefore, Syneos knew that by the time it implemented the Mandate that the policy would disproportionately impact religious employees and that the medical procedure it compelled would only, at best, provide a level of personal protection, and was incapable of stopping the spread of COVID-19.

578. By October 29, 2021, Syneos knew the total number of religious employees impacted by the Mandate, and knew the Mandate would have a statistically significant and negative impact on religious employees if Syneos refused to accommodate those employees.

579. Religious Plaintiffs hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine and informed Syneos of this through their respective requests for religious exemption from the Mandate. Syneos verified, in writing, the religious sincerity of the Religious Plaintiffs and the Religious Class, and was well aware before terminating Religious Plaintiffs and those similarly situated that the Mandate and its policies related thereto would have a dramatic, negative, and statistically significant impact on religious employees.

580. Syneos' compulsory vaccination policy, both in its imposition and the subsequent accommodations process, resulted in an unlawful and statistically significant disparity of resulting adverse employment actions between employees with religious objections to receiving a COVID-19 vaccine, and those who did not.

581. Alternatively, in the event another comparator is utilized, the Mandate generated an unlawful and significantly discriminatory impact on Religious Plaintiffs and the Religious Class.

115

582.     At the time it announced the Mandate, Syneos knew or should have known that a statistically significant disparity existed between its unvaccinated religious employees unable to comply with the Mandate and secular employees who were able to comply with the Mandate. Moreover, at the time it granted temporary accommodations to the Religious Class, Syneos knew the exact number of religious employees that would be negatively impacted if it were to revoke those accommodations.

583.     The Mandate was not job-related. Religious Plaintiffs successfully performed the essential functions of their jobs while unvaccinated throughout the height of the pandemic. Other Syneos' employees performed the essential functions of their jobs while unvaccinated throughout the height of the pandemic. Essentially none of the Religious Plaintiffs' sales clients and potential customers required proof of vaccination.  It is not debatable on the date Religious Plaintiffs were terminated that the mandated vaccines were incapable of preventing transmission or infection, thus, the "workplace safety" justification was not job-related when Religious Plaintiffs were terminated. In short, the Mandate was a job preference divorced from the essential functions of the Religious Plaintiffs' jobs and therefore was not job-related.

584.     Nor was the Mandate consistent with business necessity.  Syneos' failure to regularly test vaccinated individuals for COVID-19—despite its business records demonstrating that vaccinated employees comprised the overwhelming majority of COVID-19 infections within the company during the relevant timeframes—shows the asserted business justification of workplace safety and intent to mitigate the spread of COVID-19 were inauthentic. Any employer derived benefit flowing from the Mandate was peripheral to Syneos' operations and the Religious Plaintiffs' essential duties.

116

585. Thus, the "workplace safety" justification is pretext, and cannot support a legitimate business necessity defense.

586. Even if an employer rebuts the plaintiff's prima facie case for disparate impact discrimination, "a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact while still serving the employer's legitimate needs." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 277 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)). In that situation, the plaintiff will have shown that the employer's alleged business necessity is "mere pretext for discrimination." *Id.*

587. Many alternative employment practices were available that would have achieved Syneos' purported business purposes underlying the Mandate. As alternatives to termination, Syneos could have recognized natural immunity as satisfying the Mandate, required enhanced safety protocols of unvaccinated religious employees, maintained regular testing for unvaccinated employees (which is a much more reliable indicator of possible transmission workplace safety than vaccination), granted temporary remote work arrangements, or any combination of these options.

588. Moreover, Syneos' failure to implement safety protocols applicable to its vaccinated employees, despite clear evidence of their contagion risk, further delegitimizes any assertion of business necessity.

589. Syneos' removal of contact tracing policies after January 31, 2022—immediately after terminating religious employees possessing natural immunity—despite ongoing and significant rates of COVID-19 infections amongst its vaccinated workforce—severely undermines any assertion of workplace safety as a legitimate business purpose for the Mandate. Moreover, Syneos' irrational actions in terminating safety protocols for all employees after executing its mass

117

termination, with knowledge of high infection rates in its vaccinated workforce—while trumpeting its commitment to "workplace safety"—gives rise to a strong inference of a bad faith attempt to cover up the failures of, and the counterfactual justifications underlying the Mandate.

590.    The foregoing conduct, in addition to the allegations throughout this Complaint, constitutes unlawful disparate impact discrimination under 42 U.S.C. §2000e-2 *et seq*.  Plaintiffs are therefore entitled to equitable relief.

591.    In addition, as a direct and proximate consequence of Syneos' actions, the Religious Plaintiffs have suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined as this case proceeds to the extent permitted under applicable law.

592.    As a direct and proximate result of Syneos' discriminatory actions, Plaintiffs are suffering the injuries and damages hereinafter described.  Accordingly, Plaintiffs request relief as hereinafter described.

<u>**COUNT IV**</u>

**Violation of the ADA, 42 U.S.C. §12112, *et seq*.**
**Disability discrimination – Failure to Accommodate and/or Disparate Treatment**
**(On behalf of the Disability Plaintiffs and the Disability Class Members)**

593.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

594.    This claim is brought by the Disability Plaintiffs for themselves and on behalf of the Disability Class. Disability Plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to Syneos' widespread pattern and practice of

118

disability-based discrimination and multiple of these plaintiffs have received a Notice of Right to Sue from the EEOC.

595.    Syneos was, at all relevant times hereto, an "employer" under the ADA because it had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 U.S.C. § 12111(5).

596.    Disability Plaintiffs and the Disability Class were at all relevant times hereto, "employees" under the ADA.

597.    Disability Plaintiffs and the Disability Class all have physical or mental impairments (or a record thereof) that substantially limit one or more life activities. As such, Disability Plaintiffs and the Disability Class possess disabilities protected under the ADA.

598.    Disability Plaintiffs and members of the Disability Class also have disabilities that would be triggered (or were already triggered) by receipt of a COVID-19 vaccine. Triggering or exacerbation of their disability would result in their inability to perform daily life activities, including work, and impair the functioning of various bodily systems.

599.    Syneos had actual knowledge that individuals with medical impairments like those possessed by members of the Disability Class were placed at outsized risk of suffering serious bodily injury or death if they received a COVID-19 vaccine.

600.    Without lawful or rational justification, and with reckless disregard of their ADA rights, Syneos forced these employees to choose between the risk of suffering serious bodily injury or death and their careers.

601.    Disability Plaintiffs and members of the Disability Class were otherwise qualified for their positions; they could perform the essential functions of their jobs with or without a

119

reasonable accommodation, as evidenced by their strong performance records during all relevant periods.

602. Critically, Disability Plaintiffs performed the essential functions of their job while unvaccinated before the Mandate was instituted. They could have continued to do so after the Mandate. Syneos inflicted the purported undue hardship on itself by instituting the Mandate in the first place, with knowledge that the required vaccines were not preventing and could not prevent transmission or infection. Regardless, after the Mandate was instituted, Disability Plaintiffs could have continued to perform the essential functions of their jobs with or without reasonable accommodation.

603. Disability Plaintiffs and the Disability Class informed Syneos of their respective disabilities and need for an accommodation through their respective applications for medical exemptions.

604. Syneos explicitly acknowledged that Disability Plaintiffs and members of the Disability Class had medical impairments that qualified them for accommodations to the Mandate.

605. Because they possessed ADA qualifying disabilities, Syneos granted Disability Plaintiffs and the Disability Class medical exemptions and accommodations to the Mandate. These employees continued to perform the essential functions of their roles while accommodated.

606. Syneos then uniformly revoked accommodations for Disability Plaintiffs on December 9, 2021.

607. By December 9, 2021, Syneos knew, when it revoked accommodations for Disability Plaintiffs and the Disability Class, that: (1) the number of clients and prospective clients that were requiring proof of COVID-19 vaccination were either non-existent, or a negligeble and

120

immaterial percentage of the total accounts; (2) 90% of its workforce had been vaccinated and could be reassigned to any account needing a vaccinated representative; (3) of the clients and prospective clients not requiring proof of vaccination, very few if any required proof of negative COVID-19 testing or vaccination to enter the premises for sales calls; (4) for those accounts requiring proof of a negative test or vaccination, no-cost and low-cost COVID-19 testing options were publicly available; (5) that its vaccinated employees were contracting COVID-19 at very high rates; and (6) it already had infrastructure in place to continue logging testing without additional administrative costs.

608.  Syneos took adverse employment action against Disability Plaintiffs and members of the Disability Class by uniformly revoking accommodations on December 9, 2021, without rational or lawful justification.  Syneos took additional adverse against these employees when it executed its mass termination scheme in late January of 2022.

609.  The ADA imposes an ongoing duty to employers to engage in the interactive process for reasonable accommodation. After revoking Disability Plaintiffs' accommodations, Syneos uniformly refused to engage in the interactive process with each Disability Plaintiff and members of the Disability Class. Syneos did not individually assess possible alternative accommodations that would not constitute "significant difficulty or expense" to Syneos. 42 U.S.C. § 12103(10)(A).

610.  Many medically exempt employees, including several Disability Plaintiffs, made requests to Syneos to further engage in the interactive process after December 9, 2021. In response, Syneos sent uniform emails devoid of any individualized assessment.

121

611. Syneos, prior to granting the temporary accommodation, made a company-wide decision that it would not permanently accommodate employees who had ADA qualifying disabilities, regardless of whether it could have accommodated Disability Plaintiffs and members of the Disability Class without undue hardship.

612. There were multiple reasonable accommodations available for the Disability Plaintiffs and members of the Disability Class that would not have imposed an undue hardship, however, Syneos refused to offer these options, which included but were not limited to: (1) recognition of natural immunity, (2) temporary telework, (3) regular COVID-19 testing requirements (which is a more accurate and reliable indicator of COVID-19 infection than vaccination), (4) enhanced safety protocols, or (5) through any combination of the above options.

613. Syneos intentionally granted the period of accommodation to strategically posture itself against future legal liability and to manufacture illusory hardship through the 'cost' of testing.

614. Despite Syneos' assertions through EEOC Position Statements that the cost of testing posed an undue hardship, at the time Syneos terminated members of the Disability Class, COVID-19 tests were available throughout the country at no cost to Syneos.

615. Had Syneos engaged in the interactive process with each Disability Class Member, the "parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 347 (4th Cir. 2013).

616. Despite its ability to accommodate at low and no-cost, Syneos knowingly revoked accommodations from the Disability Class, with awareness that doing so would result in a large percentage of disabled employees being terminated.

122

617.    Syneos terminated the Disability Plaintiffs and members of the Disability Class because they were unable to comply with the Mandate, due to their ADA qualifying disabilities.

618.    Syneos has not and cannot provide facts to support that accommodating Disability Plaintiffs, or the Disability Class, would pose a "significant risk to the health or safety of others that [could] not be eliminated by reasonable accommodation." 42 U.S.C. 12111(3).

619.    Because Disability Plaintiffs were able to continue the essential function of their jobs without needing to show proof of COVID-19 vaccination, or proof of a negative COVID-19 test, Syneos could have simply exempted the Disability Class without significant difficulty or expense.

620.    Even if certain members of the Disability Class worked for clients requesting COVID-19 testing, the Disability Plaintiffs were willing to pay any additional cost for regular testing if it would have salvaged their careers. Syneos could have also easily rearranged work assignments to service such customers, allowing vaccinated employees (who comprised over 90% of the workforce) to exchange job assignments with Disability Plaintiffs and those similarly situated.

621.    Syneos' knowledge that its vaccinated employees were contracting COVID-19 at the same, similar, or likely greater rates than members of the Disability Class, while refusing to impose safety protocols on those vaccinated individuals, undermines any assertion that the Disability Class posed any greater risk or more of a direct threat to others than its vaccinated employees.

622.    Considering these factors, and all allegations contained in this Complaint, Syneos terminated Disability Plaintiffs and members of the Disability Class "because of" their disabilities.

123

623. Syneos engaged in an intentional, company-wide, and systematic policy, pattern, and practice of disability-based discrimination against the Disability Class, originating from its Morrisville, North Carolina headquarters. Without lawful justification, Syneos pretextually determined as a corporate policy it could not accommodate members of the Disability Class, and decided to purge as many disabled employees as it possibly could while using the Mandate as its chosen vehicle to accomplish its unlawful agenda.

624. The foregoing conduct constitutes unlawful disability-based discrimination under 42 U.S.C. §12112 *et seq*.

625. Syneos could have accommodated members of the Disability Class without "significant difficulty or expense." *Id.*

626. Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Disability Plaintiffs and the Disability Class members under the ADA. As a consequence of Syneos' discriminatory conduct, Disability Plaintiffs and the Disability Class have suffered economic and pecuniary damages for which they are entitled to judgment.

627. In addition, as a direct consequence of Syneos' actions, the Disability Plaintiffs have suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

628. Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT V

### Violation of the ADA, 42 U.S.C. §12101, *et seq.*
### Disability discrimination – Failure to Accommodate and/or Disparate Treatment
### Disability-Based Discrimination
### (On behalf of Plaintiffs Slagle, Sellers, Husain, and Dailey, and Disability Class
### Natural Immunity Subclass Members)

629.　Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

630.　This claim is brought by Plaintiffs Slagle, Sellers, Husain, and Dailey (collectively, "**Disability N.I. Plaintiffs**") for themselves and on behalf of the Natural Immunity Subclass (the "**Subclass**").

631.　Disability N.I. Plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to Syneos' widespread pattern and practice of disability-based discrimination and Plaintiff Sellers received a Notice of Right to Sue from the EEOC.

632.　Disability N.I. Plaintiffs and the Subclass all have physical or mental impairments (or a record thereof) that substantially limit one or more life activities. As such, Disability N.I. Plaintiffs and the Subclass possess disabilities protected under the ADA.

633.　Disability N.I. Plaintiffs and the Subclass also have disabilities that would be triggered (or were already triggered) by receipt of a COVID-19 vaccine. Triggering or exacerbation of their disability would result in their inability to perform daily life activities, including work, and impair the functioning of various bodily systems.

125

634.    Disability N.I. Plaintiffs and members of the Subclass were otherwise qualified for their positions; they could perform the essential functions of their jobs with or without a reasonable accommodation.

635.    Disability N.I. Plaintiffs and the Subclass informed Syneos of their respective disabilities and need for an accommodation through their respective applications for medical exemption to the Mandate.

636.    Syneos explicitly acknowledged that N.I. Disability Plaintiffs and members of the Subclass had medical impairments that qualified them for accommodations to the Mandate.

637.    Because they possessed ADA qualifying disabilities, Syneos granted N.I. Disability Plaintiffs and the Subclass medical exemptions and accommodations to the Mandate. These employees continued to perform the essential functions of their roles while accommodated.

638.    For the same reasons Syneos discriminated against the Disability Class under a failure to accommodate and a traditional dipsarate treatment theory, Syneos also discriminated against members of the Disability N.I. Class. Accordingly, Count IV's allegations are incorporated herein by reference.

639.    However, because the Disability N.I. Plaintiffs were able to show proof of their natural immunity on or before date they were terminated, Syneos' discriminatory actions towards them were even more egregious.

640.    Disability N.I. Plaintiffs and the Natural Immunity Subclass possessed natural immunity to COVID-19 at the time Syneos terminated them, and Syneos had actual and/or constructive knowledge of their natural immunity when it terminated their employment.

126

641.    Syneos made clear to employees that it would not recognize natural immunity as satisfying the company's immunization requirements and that it would not recognize natural immunity as a possible reasonable accommodation. Had Syneos announced it would recognize natural immunity, every unvaccinated and medically impaired employee who had been immunized through prior COVID-19 infection would have submitted proof of natural immunity to save their jobs.

642.    Many naturally immune disabled employees did not obtain proof of their natural immunity because Syneos had made clear it would not recognize it as satisfying the Mandate's requirements.

643.    If Syneos would have announced, as it should have, that immunization through prior infection would satisfy the requirements of the Mandate, or as a qualifying reasonable accommodation option, members of the N.I. Disability Class would have shown proof of their natural immunity in order to preserve their jobs.

644.    Syneos' systematic, company-wide refusal to recognize natural immunity, which has been established through hundreds of years of scientific research and will be affirmed by Syneos' own business records and proof to be shown at trial, forced members of the Natural Immunity Disability Subclass, without lawful or rational justification, to choose between suffering serious bodily injury or death, and their careers.

645.    Syneos had actual knowledge that individuals with medical impairments like those possessed by members of the Natural Immunity Disability Subclass were placed at outsized risk of suffering serious bodily injury or death if they received a COVID-19 vaccine.

646.     Syneos had actual knowledge that natural immunity was providing at least equivalent protection against COVID-19 as vaccination.

647.     Syneos explicitly acknowledged that members of the Natural Immunity Disability Subclass had medical conditions that qualified for accommodations.

648.     Syneos provided a temporary accommodation to Disability N.I. Plaintiffs and the Natural Immunity Disability Subclass, but ultimately revoked that accommodation on December 9, 2021.

649.     Several Disability N.I. Plaintiffs presented their natural immunity as an alternative to vaccination to Syneos, which Syneos refused to recognize.

650.     The ADA imposes an ongoing duty to employers to engage in the interactive process for reasonable accommodation. After revoking Disability Plaintiffs' accommodations, Syneos uniformly refused to engage in the interactive process with each N.I. Plaintiff and members of the Subclass to individually assess possible alternative accommodations that would not constitute "significant difficulty or expense" to Syneos. 42 U.S.C. § 12103(10)(A).

651.     Disability N.I. Plaintiffs made several requests to Syneos to further engage in the interactive process after December 9, 2021, but were sent uniform emails devoid of any individualized assessment.

652.     There were many low-cost and no-cost reasonable accommodation options available Syneos could have provided to members of the Disability Natural Immunity Subclass.

653.     Syneos did not participate in good faith in the interactive process after revoking the existing accommodations on December 9, 2021, and refused to consider natural immunity as an accommodation to the Mandate, despite the fact that doing so would have cost nothing for Syneos.

128

654. Had Syneos engaged in the interactive process with each Natural Immunity Disability Subclass member, the "parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." *Wilson* 717 F.3d at 347.

655. Because Subclass members were able to continue the essential function of their jobs without needing to show proof of COVID-19 vaccination, or proof of a negative COVID-19 test, Syneos could have recognized natural immunity as a substitute for artificial immunity from vaccination without any expense whatsoever.

656. Natural immunity affords the same, if not greater, protections from re-infection than protecting from reinfection received through vaccination. Consequently, Syneos cannot show that accommodating the Natural Immunity Subclass would pose a "significant risk to the health or safety of others that [could] not be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).

657. Syneos had knowledge that members of the Natural Immunity Disability Subclass were contracting COVID-19 at the same, similar, or likely even significantly lower rates than vaccinated employees. Thus, requiring members of the Natural Immunity Disability Subclass to nevertheless be vaccinated is irreconcilable with any type of purported "business necessity." 42 U.S.C. § 12113(a).

658. Syneos engaged in an intentional, company-wide, and systematic policy, pattern, and practice of disability-based discrimination against Disability N.I. Plaintiffs and the Subclass, originating from its Morrisville, North Carolina headquarters. Without lawful justification, Syneos

129

pretextually determined as a corporate policy it could not accommodate employees with ADA qualifying disabilities who also possessed natural immunity.

659.     Considering these factors, and all allegations contained in this Complaint, Syneos terminated N.I. Plaintiffs and the Subclass "because of" their disabilities.

660.     The foregoing conduct constitutes unlawful disability discrimination under 42 U.S.C. §12112 *et seq*.

661.     Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Disability N.I. Plaintiffs and the Subclass members under ADA. As a direct and proximate result of the discriminatory treatment experienced because of Syneos' discriminatory conduct, Disability N.I. Plaintiffs and the Subclass have suffered and continue to suffer economic and pecuniary damages for which they are entitled to judgment.

662.     In addition, as a direct and proximate consequence of Syneos' actions, the Disability N.I. Plaintiffs and the Subclass have suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by a jury.

663.     Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT VI

### Violation of the ADA, 42 U.S.C. §12101, *et seq.*
### "Regarded As" Disability-Based Discrimination
### (On behalf of Regarded As Disability Plaintiffs and Regarded As Disability Class Members)

664.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

130

665.     This claim is brought by members of the Regarded As Disability Class (hereinafter, the "**R/A Class**") who do not meet the statutory definition of §12102(1)(a)-(b), but were nevertheless granted temporary disability accommodations by Syneos after Syneos regarded them as though they were disabled

666.     The ADA prohibits employer discrimination against those employees who an employer regards as disabled, and then acts adversely against that employee because of the perceived disability.  *See* 42 U.S.C. § 12102 (1)(C) (defining disability under the Act as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; and (C) being **regarded as** having such an impairment") (emphasis added).

667.     Syneos was very concerned that unvaccinated employees would burden their workforce due to their perceived disabilities.  Specifically, after acknowledging members of the R/A Class's medical impairments and providing temporary accommodations under the ADA, the company revoked the accommodations on grounds that members of the R/A class would "not be able to adequately perform the essential functions of [their] role[s] without posing an undue hardship on" on the company.

668.     Syneos acted as though unvaccinated employees with medical impairments would burden the company through, among other things, presenting an increased risk to miss work due to their medical impairments that precluded vaccination, which in Syneos' mind would result in decreases to company productivity.

669.     This is precisely the type of conduct Congress sought to eliminate when enacting the ADA.  *See, e.g., School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987)) (with the

"regarded as" prong, Congress chose to extend the protections of the ADA to individuals who have no actual disability. The primary motivation for the inclusion of misperceptions of disabilities in the statutory definition was that "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment.").

670.    Members of the R/A Class received written confirmation from Syneos that it acknowledged each Member's stated medical impairment as qualifying for ADA protections by way of a reasonable accommodation.

671.    After acknowledging the medical impairments of the R/A Class as qualifying for accommodation, Syneos subsequently accommodated R/A Class Members and treated them as though they were disabled through providing reasonable accommodations.

672.    As an accommodation to their perceived disabilities, Syneos provided COVID-19 testing, or allowed them to adhere to the status quo through December 9, 2021.

673.    During this time, R/A Class Members continued to conduct in-person sales calls and traveled to events without additional restrictions by current or prospective clients and customers. On the whole, R/A Class Members were not required to show proof of COVID-19 vaccine or a negative test to attend events or conduct sales calls or to perform their jobs.

674.    In acknowledging the asserted disability and temporarily accommodating the R/A Class, Syneos regarded R/A Class Members as disabled.

675.    The ADA does not protect perceived disabilities that are both transitory and minor. 42. U.S.C. § 12101(3)(B). The ADA defines a "transitory impairment" as one with an "actual or expected duration of 6 months or less." *Id.*

132

676.     By its actions, Syneos demonstrated that it viewed members of the R/A Class as though they possessed a disability that was neither transitory nor minor.

677.     After acknowledging members of the R/A Class's qualifying medical impairments in September of 2021, Syneos demonstrated that it viewed those impairments as a long-term liability to the company by stating that it could not continue accommodating R/A Plaintiffs past January 31, 2022. Syneos acted as though the issues of Plaintiffs' medical impairments would persist long past January 31, 2022.

678.     Syneos treated members of the R/A Class as though they presently were and for the indefinite future would be incapable of performing the essential functions of their jobs because of the acknowledged medical impairments that precluded vaccination.

679.     Instead of making individualized assessment, Syneos made a corporate decision to rid itself of every employee that was or potentially was disabled.

680.     Syneos cannot demonstrate, short of hypotheticals and speculation, that R/A Class Members posed a direct threat to the workplace.  This is especially true for employees who possessed natural immunity as their immunity provided equal or superior protection to vaccine-based immunity.  Moreover, during the relevant timeframes, Syneos' vaccinated employees were contracting COVID-19 at very high rates, meaning that R/A Class Members posed no more of a direct threat to the workforce or others than their vaccinated colleagues.

681.     Syneos engaged in an unlawful pattern and practice of disability-based discrimination by terminating hundreds of employees on the basis of perceived disabilities.

682.     Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of the Disability Class and R/A Class members under the ADA. As a direct

133

and proximate consequence of Syneos' discriminatory conduct, R/A Class members have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

683. In addition, as a direct and proximate consequence of Syneos' actions, R/A Class members have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

684. Accordingly, Plaintiffs request relief as hereinafter described.

<u>COUNT VII</u>

**Violation of the ADA, 42 U.S.C. §12101,** *et seq.*
**"Regarded As" Disability-Based Discrimination**
**(On behalf of Plaintiffs Sellers, Dailey, Husain, and Slagle and "Regarded As" Disability Natural Immunity Subclass Members)**

685. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

686. This claim is brought by members of the Regarded As Disability Natural Immunity Subclass.

687. This claim is in all material respects identical to the cause of action outlined immediately above in Count VI. Accordingly, the allegations in that Count are incorporated herein by reference.

688. However, Syneos' actions in relation to members of the Regarded As Disability Natural Immunity Subclass were even more egregious because they possessed natural immunity against COVID-19 on the date they were terminated.

689. Accordingly, Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of the Regarded As Disability Natural Immunity

134

Subclass under the ADA. As a direct and proximate consequence of Syneos' discriminatory conduct, Regarded As Disability Natural Immunity Subclass members have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

690.    In addition, as a direct and proximate consequence of Syneos' actions, Regarded As Disability Natural Immunity Subclass members have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

691.    Accordingly, Plaintiffs request relief as hereinafter described.

### COUNT VIII

**Violation of the ADA, 42 U.S.C. §12101, *et seq.***
**Disability discrimination – Disparate Impact**
**(On behalf of Disability Plaintiffs and Disability Class Members)**

692.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

693.    This claim is brought by Disability Plaintiffs for themselves and on behalf of the Disability Class.

694.    Disability Plaintiffs and the Disability Class all have physical or mental impairments (or a record thereof) that substantially limit one or more life activities. As such, Disability Plaintiffs and the Disability Class possess disabilities protected under the ADA.

695.    Disability Plaintiffs and the Disability Class also have disabilities that would be triggered (or were already triggered) by receipt of a COVID-19 vaccine. Triggering or

135

exacerbation of their disability would result in their inability to perform daily life activities, including work, and impair the functioning of various bodily systems.

696. Disability Plaintiffs and members of the Disability Class were otherwise qualified for their positions; they could perform the essential functions of their jobs with or without a reasonable accommodation.

697. The Mandate, while facially neutral, served to eliminate essentially every Syneos employee with a disability precluding them from receiving a COVID-19 vaccine.

698. This obviously generated a statistically significant disparity. Syneos' business records will demonstrate the precise level of unlawful disparity the Mandate had on disabled employees unable to become vaccinated when compared to relevant comparator population(s).

699. When it instituted the Mandate, Syneos knew or should have known that a very large percentage of its unvaccinated workforce had declined vaccination due to documented disabilities. When it instituted the Mandate, Syneos also knew that the mandated vaccines did not stop transmission or infection.

700. Therefore, Syneos knew that by the time it implemented the Mandate, that the policy would disproportionately impact disabled employees, that the medical procedure it compelled would only at best provide an undefined level of personal protection, and that the mandated vaccines were incapable of preventing infection or transmission of COVID-19.

701. By October 29, 2021, Syneos knew the approximate number of disabled employees that would be impacted by the Mandate, and knew the Mandate would have a statistically significant and negative impact on disabled employees if Syneos refused to accommodate those employees.

702. Disability Plaintiffs and the Disability Class informed Syneos of their respective disabilities and need for an accommodation through their respective applications for medical exemption from the Mandate.

703. Syneos explicitly acknowledged that Disability Plaintiffs and members of the Disability Class had medical impairments that qualified them for accommodations to the Mandate.

704. Syneos was well aware before terminating Disability Plaintiffs and those similarly situated that the Mandate and its policies related thereto would have a dramatic, negative, and statistically significant impact on disabled employees.

705. Syneos' compulsory vaccination policy, both in its imposition and the subsequent accommodations process, resulted in an unlawful and statistically significant disparity of resulting adverse employment actions between employees with disabilities and those without.

706. Alternatively, in the event another comparator is utilized, the Mandate generated an unlawful and significantly discriminatory impact on the Disability Class.

707. At the time it announced the Mandate, Syneos knew or should have known that a statistically significant disparity existed between its unvaccinated disabled employees unable to comply with the Mandate and non-disabled employees able to comply with the Mandate.

708. Moreover, at the time it granted temporary accommodations to the Disability Class, Syneos knew the exact number of disabled employees that would be negatively impacted if it were to revoke those accommodations.

709. The Mandate was not job-related. Disability Plaintiffs successfully performed the essential functions of their jobs while unvaccinated throughout the height of the pandemic. Many other Syneos employees performed the essential functions of their jobs while unvaccinated

137

throughout the height of the pandemic. Essentially none of Disability Plaintiffs' sales clients and potential customers required proof of vaccination.

710.    It is unduspited that on the date Disability Plaintiffs were terminated, the mandated vaccines were incapable of preventing transmission or infection, thus, the "workplace safety" justification was not job-related on the date Disability Plaintiffs were terminated. In short, the Mandate was a job preference divorced from the essential functions of the Disability Plaintiffs' jobs and therefore was not job-related.

711.    Nor was the Mandate consistent with business necessity.  Syneos' failure to regularly test vaccinated individuals for COVID-19—despite its business records demonstrating that vaccinated employees comprised the overwhelming majority of COVID-19 infections within the company during the relevant timeframes—shows the asserted business justification of workplace safety and intent to mitigate the spread of COVID-19 were inauthentic. Any employer derived benefit flowing from the Mandate was peripheral to Syneos' operations and the Disability Plaintiffs' essential duties.

712.    Thus, the "workplace safety" justification is pretext, and cannot support a legitimate business necessity defense.

713.    Even if an employer rebuts the plaintiff's prima facie case for disparate impact discrimination, "a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact while still serving the employer's legitimate needs." *Anderson.*, 406 F.3d at 277 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)). In that situation, the plaintiff will have shown that the employer's alleged business necessity is "mere pretext for discrimination." *Id.*

138

714.    Many alternative employment practices were available that would have achieved Syneos' purported business purposes underlying the Mandate. As alternatives to termination, Syneos could have recognized natural immunity as satisfying the Mandate, required enhanced safety protocols of unvaccinated religious employees, maintained regular testing for unvaccinated employees (which is a much more reliable indicator of possible transmission and workplace safety than vaccination), granted temporary remote work arrangements, or any combination of these options.

715.    Moreover, Syneos' failure to implement safety protocols applicable to its vaccinated employees, despite clear evidence of their contagion risk, further delegitimizes any assertion of business necessity.

716.    Syneos' removal of contact tracing policies after January 31, 2022—immediately after terminating disabled employees possessing natural immunity—despite ongoing and significant rates of COVID-19 infections amongst its vaccinated workforce—severely undermines any assertion of workplace safety as a legitimate business purpose for the Mandate. Moreover, Syneos' irrational actions in terminating safety protocols for all employees after executing its mass termination, with knowledge of high infection rates in its vaccinated workforce—while trumpeting its commitment to "workplace safety"—gives rise to a strong inference of a bad faith attempt to cover up the failures of, and the counterfactual justifications underlying the Mandate.

717.    The foregoing conduct, in addition to the allegations throughout this Complaint, constitutes unlawful disparate impact discrimination under 42 U.S.C. §12112 *et seq*. Plaintiffs are therefore entitled to equitable relief.

139

718.     In addition, as a direct and proximate consequence of Syneos' actions, the Disabled Plaintiffs and the Disability Class have suffered non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined as this case proceeds to the extent permitted under applicable law.

719.     As a direct and proximate result of Syneos' discriminatory actions, Plaintiffs are suffering the injuries and damages hereinafter described.

720.     Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT IX

**Violation of Title VII, 42 U.S.C. §2000e, *et. seq*.**
**Retaliation**
**(On behalf of Religious Plaintiffs and the Religious Class)**

721.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

722.     Religious Plaintiffs bring this claim on behalf of themselves and all members of the Religious Class.

723.     To establish a Title VII retaliation claim, plaintiffs must show that they (1) engaged in protected activity, (2) Syneos took adverse action against them, and (3) a causal relationship between the protected activity and the adverse employment action. *Roberts v. Glenn Industrial Grp.*, 998 F.3d 111, 122 (4th Cir. 2021).

724.     In the Fourth Circuit, protected activity encompasses an employee's request for accommodation. *Thomas v. City of Annapolis*, 851 F. App'x 341, 350 (4th Cir. 2021) (protected activity includes "request[ing] an accommodation").

725.    All Religious Plaintiffs and Religious Class Members engaged in protected activity by filing their respective requests for religious accommodation via their religious exemption requests.

726.    During the relevant timeframes, from September 2021 through January 2022, many unvaccinated religious employees were vocal about the irrational nature of the Mandate, considering that vaccinated employees were obviously contracting COVID-19 at high rates.

727.    Members of the Religious Class embarrassed Syneos' management through pointing out the absurdity of the compelled vaccination policy and glaring failure and hypocritical nature of the Mandate.

728.    Syneos then devised a corporate plan to rid itself of these employees who had sought religious accommodation.

729.    After receiving the Religious Class Members' exemption requests, Syneos soon thereafter took adverse action against their employment. On December 9, 2021, Syneos revoked Religious Plaintiffs' and Religious Class Members' accommodations.

730.    Syneos revoked previously provided religious accommodations because it disfavored Plaintiffs' religious beliefs, and consequently, abhorred their need to seek religious accommodation. Syneos believed it was ridiculous that anyone would seek an exemption to a COVID-19 vaccination for religious reasons and was motivated to rid itself of employees who dared to take a counter position because of their religious beliefs through seeking accommodation.

731.    Many of Syneos' unvaccinated religious employees thereafter forcefully challenged the revocation of religious accommodations, highlighting the absurdity of Syneos' policy as the mandated vaccines were not preventing infection or transmission, asserting that there

141

were many low and no-cost accommodations available, that they were teleworking and were not a threat (as Syneos falsely claimed), and that they had equivalent or superior protection through natural immunity.

732. Soon thereafter, in a uniform, corporate-wide action, Syneos terminated most if not all employees who had sought religious exemption to the Mandate on the same day, January 31, 2022.

733. Syneos made the corporate-wide decision to then subsequently flag each respective termination of members of the Religious Class as "for cause" or for "misconduct" (or some iteration of fault).

734. The mass terminations of Religious Class Members were not "for cause." Members of the Religious Class were terminated due to their inability to comply with the Mandate because of their sincere religious beliefs and Syneos' purported inability to reasonably accommodate them. Without lawful justification, Syneos designated the terminations of Religious Class Members the same as employees who willfully violated company policy (e.g., stealing company property or assaulting a co-worker).

735. Because Syneos classified Religious Class Members' terminations as "for cause" (or other designation to that effect), several Religious Class Members were delayed or denied unemployment benefits. Syneos contested many of Religious Class Members' eligibility for unemployment benefits with their respective state unemployment agencies because Religious Class Members had sought religious exemption from the Mandate.

736. Syneos' normal employment practice is not to designate those laid off in a mass-layoff situation as "for cause." Syneos flagged terminations of members of the Religious Class as

142

"for cause" because of their disfavored religious beliefs and because they had sought religious accommodation to the Mandate.

737. In addition, despite Syneos' written policy on bonuses, Syneos had a common unwritten practice of paying out bonuses to those employees terminated in a mass layoff situation. Syneos regularly denied bonus payouts to those terminated "for cause."

738. Despite being laid off due to Syneos' inability to accommodate their respective religious conflicts with the Mandate, Syneos treated Religious Plaintiffs and Religious Class Members as if their terminations were "for cause" and withheld their bonus payouts.

739. Because Syneos departed from its common separation practices for mass layoffs and instead acted as if Religious Plaintiffs and Religious Class Members were terminated at their own fault for violating policy (rather than for Syneos' purported inability to accommodate religious employees), such behavior would reasonably dissuade employees from engaging in protected activity under Title VII.

740. The foregoing constitutes unlawful retaliation under 42 U.S.C. §2000e, *et. seq*.

741. Because the retaliatory scheme was hatched at and implemented from the top levels of the company, Syneos engaged in an unlawful pattern and practice of retaliation against members of the Religious Class.

742. Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Religious Plaintiffs and the Religious Class members under Title VII. As a direct and proximate consequence of Syneos' discriminatory conduct, Religious Plaintiffs and the Religious Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

743. In addition, as a direct and proximate consequence of Syneos' actions, the Religious Plaintiffs have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

744. Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT X

**Violation of the ADA, 42 U.S.C. §12203, *et seq.***
**Retaliation**
**(On behalf of Disability Plaintiffs and the Disability Class)**

745. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

746. Disability Plaintiffs bring this claim on behalf of themselves and all members of the Disability Class.

747. Syneos uniformly retaliated against hundreds of its disabled employees who sought disability-based exemptions from the Mandate.

748. To establish a retaliation claim under the ADA, plaintiffs must show that they (1) engaged in protected activity, (2) Syneos took adverse action against them, and (3) a causal relationship between the protected activity and the adverse employment action. *City of Annapolis*, 851 F. App'x 341 at 350.

749. Disability Plaintiffs and the Disability Class all have physical or mental impairments (or a record thereof) that substantially limit one or more life activities. As such, Disability Plaintiffs and the Disability Class possess disabilities protected under the ADA.

750. Disability Plaintiffs and the Disability Class also have disabilities that would be triggered (or were already triggered) by receipt of a COVID-19 vaccine. Triggering or exacerbation of their disability would result in their inability to perform daily life activities, including work, and impair the functioning of various bodily systems.

751. Disability Plaintiffs and members of the Disability Class were otherwise qualified for their positions; they could perform the essential functions of their jobs with or without reasonable accommodation.

752. During the relevant timeframes, from September 2021 through January 2022, many unvaccinated disabled employees were vocal about the irrational nature of the Mandate, considering that vaccinated employees were obviously contracting COVID-19 at high rates.

753. Members of the Disability Class embarrassed Syneos' management through pointing out the absurdity of the compelled vaccination policy and glaring failure and hypocritical nature of the Mandate.

754. Syneos then devised a corporate plan to rid itself of these employees who had sought disability-based accommodation.

755. After receiving the Disability Class Members' exemption requests, Syneos soon thereafter took adverse action against their employment. On December 9, 2021, Syneos uniformly revoked Disability Plaintiffs' and Disability Class Members' accommodations.

756. During the relevant timeframes, from September 2021 through January 2022, many unvaccinated, disabled employees were vocal about the irrational nature of the Mandate, considering that vaccinated employees were obviously contracting COVID-19 at high rates and publicly embarrassed Syneos' management through pointing out the absurdity of the policy.

145

757.     Syneos devised a corporate plan to rid itself of these employees who had sought disability-based accommodation and/or who opposed the Mandate's imposition against disabled employees.

758.     Disability Plaintiffs and the Disability Class informed Syneos of their respective disabilities and need for an accommodation through their respective applications for medical exemption from the Mandate.

759.     All Disability Plaintiffs and Disability Class Members engaged in protected activity by filing their respective requests for disability accommodation via their medical exemption requests and through opposing the Mandate's imposition against disabled employees in the circumstances described in this Complaint.

760.     After the Disability Class Members' submitted their exemption requests, Syneos soon thereafter took adverse action against their employment.

761.     On December 9, 2021, Syneos revoked Disability Plaintiffs' and Disability Class Members' accommodations.

762.     Syneos revoked previously provided disability-based accommodations because of Plaintiffs' documented medical impairments and their need for accommodation.  Syneos believed it was ridiculous that anyone would seek an exemption to a COVID-19 vaccination, especially for disability-based reasons, and was motivated to rid itself of employees who dared to take a counter position because of their medical impairments through seeking accommodation under the ADA.

763.     Many of Syneos' unvaccinated and medical impaired employees thereafter forcefully challenged the revocation of medical accommodations, highlighting the absurdity of Syneos' policy as the mandated vaccines were not preventing infection or transmission, asserting

146

that there were many low and no-cost accommodations available, that they were teleworking and were not a threat (as Syneos falsely claimed), and that they had equivalent or superior protection through natural immunity.

764.    Soon thereafter, in a uniform, corporate-wide action, Syneos terminated all employees who had sought medical exemption to the Mandate on the same day, January 31, 2022.

765.    Syneos made the corporate-wide decision to then subsequently flag each respective termination of members of the Disability Class as "for cause" or for "misconduct" (or some iteration of fault).

766.    The mass terminations of Disability Class Members were not "for cause." Members of the Disability Class were terminated due to their inability to comply with the Mandate because of their documented medical impairments which Syneos and Syneos' purported inability to reasonably accommodate.

767.    Without lawful justification, Syneos designated the terminations of Disability Class Members the same as employees who willfully violated company policy (e.g., stealing property or assaulting a co-worker).

768.    Because Syneos classified Disability Class Members' terminations as "for cause" (or other designation to that effect), several Disability Class Members were delayed or denied unemployment benefits. Syneos contested many of Disability Class Members' eligibility for unemployment benefits with their respective state unemployment agencies because Disability Class Members had sought disability-based exemption from the Mandate.

769.    Syneos' normal employment practice is not to designate those laid off in a mass-layoff situation as "for cause." Syneos flagged terminations of members of the Disability Class as

147

"for cause" because of their disfavored religious beliefs and because they had sought accommodation to the Mandate based on medical impairments.

770. In addition, despite Syneos' written policy on bonuses, Syneos had a common unwritten practice of paying out bonuses to those employees terminated in a mass layoff situation. Syneos regularly denied bonus payouts to those terminated "for cause."

771. Despite being laid off due to Syneos' inability to accommodate their respective disability-based needs, Syneos treated Disability Plaintiffs and Disability Class Members as if their terminations were "for cause" and withheld their bonus payouts.

772. Because Syneos departed from its common separation practices for mass layoffs and instead acted as if Disability Plaintiffs and Disability Class Members were terminated at their own fault for violating company policy (rather than for Syneos' purported inability to accommodate medically impaired employees) such behavior would reasonably dissuade employees from engaging in protected activity under the ADA.

773. The foregoing constitutes unlawful retaliation under 42 U.S.C. §12203, *et seq*.

774. Because the retaliatory scheme was hatched at and implemented from the top levels of the company, Syneos engaged in an unlawful pattern and practice of retaliation against its disabled employees.

775. Syneos' actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Disability Plaintiffs and the Disability Class members under the ADA. As a direct and proximate consequence of Syneos' discriminatory conduct, Disability Plaintiffs and the Disability Class have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

776. In addition, as a direct and proximate consequence of Syneos' actions, the Disability Plaintiffs have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

777. Accordingly, Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Religious Class, the Disability Class, and the "Regarded As" Disability Class and their respective Natural Immunity Subclasses pray for relief as follows:

A. Order Syneos to make whole all individuals adversely affected by the unlawful employment practices described above, by providing the affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to instatement, reinstatement, provide front pay in lieu of reinstatement, or otherwise make whole individuals denied employment because of their religion or disability;

B. Certify the Religious Class under Federal Rule of Civil Procedure 23;

C. Certify the Natural Immunity Religious Subclass under Federal Rule of Civil Procedure 23;

D. Certify the Disability Class under Federal Rule of Civil Procedure 23;

E. Certify the Natural Immunity Disability Subclass under Federal Rule of Civil Procedure 23;

F. Certify the Regarded As Disability Class under Federal Rule of Civil Procedure 23;

149

G. Certify the Natural Immunity Regarded As Disability Subclass under Federal Rule of Civil Procedure 23;

H. Designate Plaintiffs O'Callaghan, Dailey, Kaminski, Slagle, Roberts, Spurgeon, Cipollino, Smith, and Morris as representatives of the Religious Class;

I. Designate Plaintiffs O'Callaghan, Dailey, Kaminski, Slagle, Roberts, Spurgeon, Cipollino, Smith, and Morris as representatives of the Natural Immunity Religious Subclass;

J. Designate Plaintiffs Dailey, Husain, Sellers, and Slagle as representatives of the Disability Class;

K. Designate Plaintiffs Dailey, Husain, Sellers, and Slagle as representatives of the Natural Immunity Disability Subclass;

L. In the event the Court determines any member of the Disability Class does not possess an ADA qualifying disability, designate that plaintiff or those plaintiffs as representatives of the Regarded As Disabled Class;

M. In the event the Court determines either plaintiffs Dailey, Husain, Sellers, or Slagle does not possess an ADA qualifying disability, designate that plaintiff or those plaintiffs as representative of the Natural Immunity Regarded As Disability Subclass;

N. Designate Plaintiffs' counsel of record as class counsel;

O. Enter a declaratory judgment declaring Syneos' actions to be violations of Title VII and the ADA;

P. Issue a permanent injunction requiring Syneos to expunge the personnel files of members of the Religious Class, the Disability Class, the Regarded as Disability Class and their

150

respective Subclasses of any derogatory, false, or misleading information relating to this matter;

Q. Grant members of members of the Religious Class, the Disability Class, the Regarded as Disability Class and their respective Subclasses equitable relief;

R. Order Syneos to provide training for supervisors and managers at all corporate levels specific to Title VII and the ADA;

S. Award Plaintiffs and members of members of the Religious Class, the Disability Class, the Regarded as Disability Class, and their respective Subclasses back pay (including interest and benefits), reinstatement or front pay, pre-judgment and post-judgment interest, and compensatory damages;

T. Award punitive damages under Title VII;

U. Award punitive damages under the ADA;

V. Award Plaintiffs reasonable attorneys' fees and costs; and

W. Grant any other relief that the Court deems just, proper, and equitable.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

(signatures of counsel on following page)

151

(continued from *Class Action Complaint and Demand for Jury Trial* on preceding page)


Dated: June 6, 2023

Respectfully submitted by,

SIRI & GLIMSTAD LLP

*/s/ **Dana Stone***

Dana Stone, Attorney
525 North Tryon Street
Suite 1600, #7433
Charlotte, North Carolina 28202
Phone: (980) 448-1299
Facsimile: 646-417-5967
dstone@sirillp.com

Elizabeth A. Brehm, Esq.*
Walker D. Moller, Esq.*
Jack Spitz, Esq.*
ebrehm@sirillp.com
wmoller@sirillp.com
jspitz@sirillp.com


* *Pro hac vice* motion forthcoming